## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MIGUEL COCA and | ) | |
| ALEJANDRO RANGEL-LOPEZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 6:22-cv-01274-EFM-RES |
| | ) | |
| CITY OF DODGE CITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
## EXPERT WITNESS RUBÉN MARTINEZ

### I.    Introduction and Statement of Requested Relief

Defendants move this Court to exclude Plaintiffs proffered expert witness, Dr. Rubén Martinez. Under Federal Rule of Evidence 702 and the gatekeeping responsibilities given the court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), Dr. Martinez's testimony must be excluded because he lacks the necessary qualifications to render opinions on the matters in which he purports to be an expert.

### II.    Nature of the Matter

Plaintiffs allege that the at-large election of City Commissioners in the City of Dodge City, Kansas violates the Voting Rights Act and Fourteenth Amendment. Plaintiffs engaged Dr. Martinez to "analyze the history of official discrimination in Dodge City and Kansas and the historical background of the at-large method of election in Dodge City and Kansas." Ex. 1, Martinez Expert Report 1. But Dr. Martinez's qualifications, expert report, and deposition testimony confirm he has no specialized insight into either of these topics. His testimony related to any alleged history of discrimination in Dodge City is based only on anecdotal information he

gathered from spending a few hours in Dodge City and a cherry-picked literature review he conducted solely for purposes of serving as an expert in this case. Ex. 1, Martinez Report ¶ 1.03; Ex. 2, Martinez Dep. 166:22–167:11. Before being hired in this case, he had never studied the impact of at-large elections versus multi-district elections in any context. Ex. 2, Martinez Dep. 70:23–71:10. He had not conducted any research on the Voting Rights Act, and the source of his research on the elements of Voting Rights Act violations for purposes of this report was an unidentified website. *Id.* at 66:3–67:9. Compounding the problem, Dr. Martinez failed to include citations to authority throughout his report, often leaving the reader guessing the source of the conclusion and whether the description of the information provided is reliable. *Id.* at 123:20–124:13.

Pursuant to the Court's gatekeeping responsibilities, Dr. Martinez should be excluded as an expert witness because he is not qualified "by knowledge, skill, experience, training, or education" to render any opinions in this case. *Daubert*, 509 U.S. at 590–91. Rather, his expert report is based on anecdotal information gathered without any reliable methodology and would not meet the intellectual standards required by experts in the field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Dr. Martinez will not assist the trier of fact, and his testimony should be excluded.

## III.    Statement of Facts

Dr. Martinez is a retired professor of sociology. Ex. 2, Martinez Dep. 6:21–24. For the 15 years prior to his retirement, Dr. Martinez was primarily an administrator for Michigan State University. *Id.* at 8:15–22. He describes himself as an expert in social stratification and political sociology. Ex. 1, Martinez Report ¶ 1.02. His scholarship has focused on "social inequality and intergroup relations" and "social movements and political power." *Id.*

Dr. Martinez has never lived in Kansas. Ex. 2, Martinez Dep. 46:23–25. He visited Dodge City once for two days while he was preparing his expert report. *Id.* at 46:14–19; 53:16–20. While there, he conducted one informal interview of an individual whom he asked for a restaurant recommendation. *Id.* at 13:20–21; 53:16–54:12. Dr. Martinez took no substantive notes during the meeting, he does not recall the location of the interview, and he did not ask for the individual's name. *Id.* at 54:2–22; 56:23–57:10.

Dr. Martinez's academic research does not include the State of Kansas or Dodge City. *Id.* at 47:6–21; 50:15–52:15. Before his engagement in this case, he had no specialized knowledge regarding the history of Dodge City or the State of Kansas. *Id.* at 50:23–51:13. His prior knowledge is limited to having read one book on the Earp brothers, some basic knowledge about Kansas history, and an awareness of Kansas Attorney General Kris Kobach. *Id.* at 51:23–53:3. The only text Dr. Martinez has drafted that in any way relates to the issues on which Dr. Martinez opines in this case is an introduction to a 2011 book written by other authors entitled *Latinos in the Midwest*. *Id.* at 25:13–26:8. Dr. Martinez believes the only reference to Kansas within that introduction is to basic demographic information. *Id.* at 25:13–25. Dr. Martinez did not review or rely on any of his own scholarship, including *Latinos in the Midwest*, in preparing his Expert Witness Report. *Id.* at 27:7–12; 28:18–30:16.

Dr. Martinez similarly had not focused any research on the Voting Rights Act or election systems prior to his engagement in this case. *Id.* at 70:9–12. He had not previously studied the impact of at-large voting systems versus multi-district voting systems on any specific population. *Id.* at 70:23–4. And he had not studied the likelihood that individuals of a certain race or ethnicity would be elected under either voting system. *Id.* at 71:5–10.

Other than the Amended Complaint, Dr. Martinez did not review any pleadings (including Defendants' Answer), other expert reports, or documents produced by the parties in this case in preparing his expert report. *Id.* at 12:15–13:15; 16:4–8; 33:16–25.

## IV.    Argument

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Under Rule 702, a witness may qualify as an expert based on his "knowledge, skill, experience, training, or education," and such a qualification allows opinion testimony if "(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a face in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *See also Daubert*, 509 U.S. at 590–91.

In *Daubert*, the Supreme Court placed a gatekeeping responsibility on federal courts to ensure that expert testimony is "reliable." *Daubert*, 508 U.S. at 589. The first step in performing this gatekeeping function is to determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.*; *United States v. Naccio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). There is no one specific test used to determine an expert's qualifications, but instead, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

To be an expert in a subject, that subject must be "within the reasonable confines" of the witness's experience, or the witness must "possess skill, experience, or knowledge" in the specific area of proposed testimony. *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (citing

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)). When considering the specific expertise of an expert, *Conroy* is instructive. There, the Tenth Circuit affirmed the lower court's finding that a proposed expert witness on the topic of sex stereotyping was unqualified based on her lack of knowledge with the subject area. In particular, the witness "had never researched or written" on the topic and "became familiar with the topic only after being retained" on the case. *Conroy*, 707 F.3d at 1168.

Similarly, in *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, No. 17-md-2785-DDC-TJJ, 2021 WL 2577490, at *49 (D. Kan. June 23, 2021), the court excluded testimony from an expert who lacked specific knowledge about the product at issue, who had no experience working in the field of study, and testified incorrectly about the subject at issue. Citing *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 586-87 (10th Cir. 1998)), the court noted that "though a proffered expert possesses knowledge in a general field, the expert who lacks *specific knowledge* does not necessarily assist the jury." *Id.*

Here, before being retained, Dr. Martinez had not conducted any research on virtually any of the topics on which he opines in this case. He has not studied the history of discrimination in Kansas, and he showed a basic unfamiliarity with the cities he references in his Report. Ex. 2, Martinez Dep. 166:22–167:11; 170:24–21. Dr. Martinez had not studied nor had any knowledge of the history of Dodge City elections. *Id.* at 191:15–19. He had not "conducted any research or scholarship regarding the effects of the at-large voting systems." *Id.* at 70:9–16. He had not studied "the impact on how likely individuals of a certain race or ethnicity" would be elected under a specific voting system. *Id.* at 71:5–16. And his expertise in "At-Large Elections and Ethnic and Racial Minority Voters"—Section 7 of his Report—is based solely on his review of studies. *Id.* at 222:21–224:3. In light of his total lack of familiarity with any alleged history of discrimination in

Kansas, the historical background of Kansas and Dodge City elections, and general election process knowledge, he is not qualified to serve as an expert on those topics.

A.    **Dr. Martinez is not qualified to opine on any alleged history of discrimination in Dodge City or Kansas.**

Dr. Martinez's report contains dozens of paragraphs opining on the alleged history of the City of Dodge City, including vague allegations of discrimination in Dodge City and in the State of Kansas with respect to housing segregation, education segregation, and segregation in public spaces. But Dr. Martinez neither is a Kansas historian (or a historian at all) nor does he have any expertise related to Dodge City or the State of Kansas. His lack of qualifications, lack of research and scholarship on the relevant topics, lack of personal experience, and lack of prior knowledge or background on the subject render his conclusions ad hoc and unsupported.

For example, he states that only "a handful of individuals from the Hispanic population" serve or have served in professional roles in local government or been elected to public office in Dodge City. Ex. 1, Martinez Report ¶ 1.01. He similarly opines that Mexicans "have not been integrated into Dodge City, particularly within the political system." *Id.* But Dr. Martinez did no comprehensive review to reach these conclusions. Rather, he looked at the City Manager's Office website and "some of the staff pages for the school district." Ex. 2, Martinez Dep. 36:15–37:4; 39:4–7; 78:21–79:1. He indicated he reviewed some "scattered" Dodge City Commission election results based on what he was able to find online, but he does not recall which website he reviewed. *Id.* at 41:15–42:19. He admits he has no information about the racial or ethnic demographic breakdown of the City of Dodge City's employees. *Id.* at 80:8–81:5. Dr. Martinez did not perform any statistical analysis and relies solely on his personal observations and review of websites to support opinions on a topic for which he had no prior knowledge. *Id.* at 77:8–81:5.

Dr. Martinez next opines that the demographic shift that has occurred in Dodge City in which the Hispanic population is growing "has likely engendered a perception of threat to political power among White Dodge Citians who are interested in retaining their dominant political position in the City." Ex. 1, Martinez Report ¶ 1.01. Dr. Martinez acknowledges he based that conclusion not on anything specific to Dodge City or even the State of Kansas, but rather on a "view in the body of literature of race relations." Ex. 2, Martinez Dep. 83:15–84:24. He did not find any authority specifically that applies that theory in Dodge City, *Id.* at 86:25–88:10, and he conducted no independent study looking for evidence of the applicability of the theory in Dodge City. *Id.* at 87:25–88:10. Dr. Martinez's unsupported conclusions are unhelpful to the trier of fact.

### Purported History of Discrimination in Dodge City

In forming his conclusions regarding the purported history of discrimination in Dodge City, Dr. Martinez merely examined theories proffered by scholars from other jurisdictions and extrapolated that information to Dodge City. *Id.* at 86:25–88:19. Much of the information he shares in his report is a regurgitation of (sometimes outdated) information he learned for the first time while preparing his report. *See, e.g.*, Ex. 1, Martinez Report ¶¶ 3.01–3.05; 3.07–3.08. For example, he alleges that meatpacking is "dangerous and disagreeable;" Ex. 1, Martinez Report ¶ 3.08; but this allegation is based on information from 1995. Ex. 2, Martinez Dep. 97:9–12. Dr. Martinez did not do any research into the changes made in the industry in the almost 30 years from 1995 to the present, nor did he do any research into the specific circumstances of the meatpacking industry in Dodge City. *Id.* at 97:13–25; 98:18–99:8.

Similarly, Dr. Martinez cites one 2009 incident of a Mexican man shooting two White men, killing one and wounding the other. Ex. 1, Martinez Report ¶ 3.13. Dr. Martinez uses this single incident—the only incident of modern-day violence between Hispanics and Whites he uncovered

in Dodge City—alongside what he described with no detail as the "more general patterns that are occurring in society today" to conclude that "there may be a racial undercurrent of anti-Hispanic sentiments." Ex. 2, Martinez Dep. 103:19–20. Dr. Martinez either was unaware or chose to overlook that the events that occurred in 2009 involved private citizens, did not involve any City policies or officials, and led the Hispanic community to "tak[e] steps to turn the situation into peaceful coexistence and turn the distrust into trust." *Id.* at 107:3–20; 109:5–10. Here, Dr. Martinez again does minimal research into the Dodge City community, imparts national trends wholesale to Dodge City, and reveals his bias in what he chooses to acknowledge and what he discards.

Dr. Martinez's Expert Report is riddled with additional unfounded factual statements in purported support of a finding of discrimination. He alleges, for example, that "meatpacking workers were not among the first groups to receive the [COVID-19] vaccine when it became available," Ex. 1, Martinez Report ¶ 3.16, but cites no sources and could not recall how he came by that information or whose choice it was to prioritize vaccines for other populations. Ex. 2, Martinez Dep. 121:5–124:22. He similarly reports that one unidentified resident of Dodge City complained to him informally about "brick-paved streets" in his neighborhood; Ex. 1, Martinez Report ¶ 3.19; but he testified that he did no research to determine whether the streets were within the boundaries of Dodge City's historic downtown or how the City prioritizes street repair within the City. Ex. 2, Martinez Dep. 139:6–142:15. Ultimately, like many of the unsupported allegations throughout his report, Dr. Martinez acknowledges that none of the issues he identified are evidence of official discrimination within the City of Dodge City. *Id.* at 142:2–10.

### Purported Housing, Education, and Public Spaces Segregation in Dodge City

Like other portions of his report, Dr. Martinez acknowledges his minimal expertise on these topics. *Id.* at 142:22–144:2. Dr. Martinez points to a purported history of restrictive housing

covenants in Dodge City; Ex. 1, Martinez Report ¶ 3.22; but when questioned, he testified that he did not review any actual restrictive covenants, had no actual knowledge of what the covenants restricted, and could not say when they were abolished. Ex. 2, Martinez Dep. 151:10–153:7. Again, Dr. Martinez purports to be an expert in an area where his knowledge is based on a single article, which he did not author, and about which he conducted no follow-up research of primary source materials.

Dr. Martinez next opines that "Dodge City remains highly segregated, with White residents concentrated in the northern part of the City and Hispanics concentrated in the southern part of the City." Ex. 1, Martinez Report ¶ 3.22. When pressed, Dr. Martinez admitted this opinion was based on nothing more than his own observations while "driving around the city and looking at residents and people in those sections of the city." Ex. 2, Martinez Dep. 153:13–17. Dr. Martinez did not review any census data or any other demographic information to inform this conclusion. Even more startling, Dr. Martinez made this conclusion while aimlessly driving around a city he had never before visited, identifying no plan to ensure he was visiting different neighborhoods or providing any analysis as to the reasons he was able to identify one house as belonging to a Latino citizen or a White citizen as he drove by. He also had no information about how the integration of housing has changed over time. *Id.* at 154:16–155:14.

***Purported History of Discrimination in Kansas***

Dr. Martinez had never studied the history of discrimination in Kansas before his engagement in this case. *Id.* at 166:22–11. He has not researched or written on the topic and only became familiar with it after being retained in this case. *Id.* at 166:22–167:7. His sources of information are limited to the research he conducted once retained. He describes, for example, HB 2717 as an "anti-immigration bill," but he could not describe the bill, had no understanding of it,

and did not know the source of the information. *Id.* at 176:15–178:13. Like the prior sections of his report, Dr. Martinez acknowledges his report contains no evidence of official discrimination by the State of Kansas; *id.* at 179:12–25; and no evidence of current discrimination by the State of Kansas; *id.* at 180:2–5.

***Purported Educational Segregation in Kansas***

Again, Dr. Martinez acknowledges extremely limited knowledge of educational segregation in Kansas prior to his engagement in this litigation. Here, his experience was limited to his general familiarity with the seminal *Brown v. Board of Education* lawsuit from 1954. *Id.* at 180:6–24. Dr. Martinez has not previously written on this topic. *Id.* at 180:25–181:3. He states conclusions in his report but cites no authority for those conclusions and could not identify all relevant authority in his deposition. Ex. 1, Martinez Report ¶¶ 5.01–5.11; Ex. 2, Martinez Dep. 188:19–189:16.

**B.     Dr. Martinez is not qualified to opine on the alleged historical background of elections in Dodge City or Kansas.**

Dr. Martinez's professional knowledge of the history of elections in Dodge City is sorely lacking. He admits that he had done no prior research or writing on the topic before being engaged in this case and that the information in this section of his report was new to him. Ex. 2, Martinez Dep. 191:13–23. Dr. Martinez could not identify when the City began using at-large elections, whether in 1911 or earlier. *Id.* at 196:25–197:18. Nor could he identify the sources for the information he cited in his report. *Id.* at 197:19–23; 200:8–16. Dr. Martinez did not know how many Mexicans had run for office in Dodge City before 1980, despite claiming in his report that "a few [had] run for office." Ex. 1, Martinez Report ¶ 6.08; Ex. 2, Martinez Dep. 200:8–19. Dr. Martinez conducted no analysis of the number of Hispanic individuals who had run for school

board in the USD 443 school district, despite including opinions related to such school board elections. Ex. 1, Martinez Report ¶¶ 6.08, 6.11; Ex. 2, Martinez Dep. 203:18–204:11.

Dr. Martinez next opines on the 2018 election in Dodge City in which Ford County moved the polling place to the Dodge City Expo Center. Ex. 1, Martinez Report ¶ 6.13. Again, he has no specialized knowledge about the events or their impact and instead merely regurgitates information, most often not citing any authority. The alleged authority he did cite is a news article quoting two unnamed individuals. He unfairly attributes from that single article a lack of adequate voter education by the Ford County Elections Office (which is not a party in this case) without any analysis as to the efforts that were undertaken or their impact. He chose not to include in his report his finding that Dodge City provides voter materials in Spanish. Ex. 2, Martinez Dep. 210:8–17. Dr. Martinez acknowledged being unaware of any actual steps the City took to encourage voter participation or whether the 2018 Ford County Clerk's decision to relocate the polling location had any impact on voter participation. *Id.* at 207:22–208:21. Once again, Dr. Martinez purports to be an expert on a topic for which he has no specialized knowledge or expertise and conducted wholly inadequate and one-sided research.

C.    **Dr. Martinez lacks adequate knowledge about elections and election practices, both generally and as relates to Dodge City and the State of Kansas.**

Section 7 of Dr. Martinez's report is perhaps the most egregious of his efforts to opine on a topic for which he has no expertise. The entirety of Section 7, At-Large Elections and Ethnic and Racial Minority Voters, Ex. 1, Martinez Report 13, is based exclusively on Dr. Martinez's review of others' research that he conducted following his retention in this case. *Id.* at 222:21–224:3. Dr. Martinez brought no prior knowledge of this subject to the report and carried out no independent studies on the topic. *Id.* at 222:21–223:3; 223:22–224:3. Dr. Martinez acknowledges that his

testimony is not specific to Dodge City and is instead limited to what he believes may be generally applicable to any election. *Id.* at 224:4–12.

Perhaps due to his lack of experience, Dr. Martinez reaches conclusions that do not account for the variety of opinions among experts on this topic. For example, Dr. Martinez opines that at-large election studies reveal "significantly less minority representation than other methods because of voter dilution." Ex. 1, Martinez Report ¶ 7.1. But this conclusion fails to acknowledge those studies Dr. Martinez reviewed that contained "mixed findings or that were inconclusive." Ex. 2, Martinez Dep. 225:2–12. Dr. Martinez was likewise unable to recall whether any cited study discussed communities with significant racial or ethnic diversity, further revealing his lack of foundational knowledge on the topic. *Id.* at 225:22–226:8. Dr. Martinez concluded that "single district elections tend to increase minority representation," Ex. 1, Martinez Report ¶ 7.7, but did not know whether the size of the city made a difference to this conclusion apart from "the concentration." Ex. 2, Martinez Dep. 241:10–18. And he admits having reviewed articles that would challenge that conclusion, but he declined to share that information in his report. *Id.* at 240:24–241:9; 236:2–15. Repeatedly, rather than acknowledging the differences of opinion among actual experts, he cites only those authorities that support the position for which he is advocating. *Id.* at 225:2–12.

Like his conclusions on alleged official discrimination in Dodge City, Dr. Martinez extrapolates national data and applies it wholesale to Dodge City. *Id.* at 242:16–20. He has no expertise on this topic, which leaves him guessing as to the applicability of the research to Dodge City. *Id.* 242:23–243:11. Repeatedly, Dr. Martinez was unable to provide any explanation for his conclusions or the context for the studies on which he relied. *Id.* at 225:22–226:9; 227:2–25;

237:3–15; 241:10–17. Dr. Martinez is simply not an expert on this topic, and this testimony should be excluded.

V.      **Conclusion**

Over and over, Dr. Martinez fails to show any expertise in the subject matter on which he was retained to testify. He has no background on the State of Kansas or the City of Dodge City and any of its particular nuances that may set it apart from national trends. And notably, Dr. Martinez did not review or use any of his personal scholarship in creating his Expert Witness Report. *See id.* at 28:18–30:16. He reveals a lack of basic knowledge of those areas on which he opines. He bases his conclusions on his extremely limited personal observations and research he conducted exclusively for purposes of this expert report, and he fails to cite authority for many of his conclusions.

While there are undoubtedly topics on which Dr. Martinez is qualified to be an expert, none are relevant to the opinions he shares in this case. For the reasons stated above, Defendants request that the testimony of Dr. Martinez be excluded.

Respectfully submitted,

**FOULSTON SIEFKIN LLP**

By: */s/ Anthony F. Rupp*
    Anthony F. Rupp, KS #11590
    Tara Eberline, KS #22576
    Sarah E. Stula, KS #27156
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas 66210
    T (913) 498-2100 | F (913) 498-2101
    trupp@foulston.com
    teberline@foulston.com
    sstula@foulston.com

    - and-

    Clayton J. Kaiser, KS #24066
    FOULSTON SIEFKIN, LLP
    1551 North Waterfront Parkway, Suite 100
    Wichita, Kansas 67206
    T (316) 267-6371 | F (316) 267-6345
    ckaiser@foulston.com

**ATTORNEYS FOR DEFENDANTS**

14

## CERTIFICATE OF SERVICE

I certify that on the 22nd of September, 2023, the foregoing was electronically filed with the Clerk of the Court by using the Court's e-Filing system which will send notification of electronic filing to counsel for all parties of record, and a true and correct copy was served by electronic mail upon:

Sharon Brett, KS #28696
**AMERICAN CIVIL LIBERTIES
UNION OF KANSAS**
sbrett@aclukansas.org


Chad W. Dunn *(Pro Hac Vice)*
Sonni Waknin *(Pro Hac Vice)*
Bernadette Reyes *(Pro Hac Vice)*
**UCLA VOTING RIGHTS PROJECT**
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org


Jonathan Topaz *(Pro Hac Vice)*
Sophia Lin Lakin *(Pro Hac Vice)*
Luis M. R. Roman *(Pro Hac Vice)*
**AMERICAN CIVIL LIBERTIES
UNION, INC.**
jtopaz@aclu.org
slakin@aclu.org
lroman@aclu.org

Abena Mainoo *(Pro Hac Vice)*
Jonathan I. Blackman *(Pro Hac Vice)*
JD Colavecchio *(Pro Hac Vice)*
Mijin Kang *(Pro Hac Vice)*
Elizabeth R. Baggott *(Pro Hac Vice)*
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
amainoo@cgsh.com
jblackman@cgsh.com
jdcolavecchio@cgsh.com
mkang@cgsh.com
ebaggott@cgsh.com


Scott Fuqua *(Pro Hac Vice)*
**FUQUA LAW & POLICY, P.C.**
scott@fuqualawpolicy.com


***ATTORNEYS FOR PLAINTIFFS***


  /s/*Anthony F. Rupp*