EXHIBIT

**2**

Page 1

1

2  IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

3  ------------------------------------------X

MIGUEL COCA AND ALEJANDRO RANGEL-LOPEZ,

4

                          PLAINTIFFS,

5

6        -against-      Case No.:

               6:22-cv-01274-EFM-RES

7

8  CITY OF DODGE CITY, et al.,

9                  DEFENDANTS.

  ------------------------------------------X

10

11          DATE: June 21, 2023

12          TIME: 9:09 A.M.

13

14        Virtual DEPOSITION of a

15  Non-Party Witness, DR. RUBEN MARTINEZ,

16  taken by the Defendant, pursuant to a

17  Notice and to the Federal Rules of Civil

18  Procedure, held at the offices of Cleary

19  Gottlieb Steen & Hamilton, LLP, One Liberty

20  Plaza, New York, New York 10006, before

21  Anna Khodachnik, a Notary Public of the

22  State of New York.

23

24

25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
         Attorneys for the Plaintiffs
 5       MIGUEL COCA and ALEJANDRO RANGEL-LOPEZ
         One Liberty Plaza
 6       New York, New York 10006
         BY: ABENA MAINOO, ESQ.
 7           JD COLAVECCHIO, ESQ.
             JONATHAN TOPAZ, ESQ. (Via Zoom)
 8           ISABELLA MASIELLO, ESQ. (Via Zoom)
 9
10    FOULSTON SIEFKIN LLP
         Attorneys for the Defendant
11       CITY OF DODGE CITY, et al.
         7500 College Boulevard, Suite 1400
12       Overland Park, Kansas 66210
         BY: TARA EBERLINE, ESQ.
13               -and-
             BRAD RALPH, ESQ. (Via Zoom)
14
15
16
                  *         *         *
17
18
19
20
21
22
23
24
25
```

1                       R. MARTINEZ

2   uh-huh.  So if I happen to catch you giving

3   an answer that way, I might ask you to

4   clarify and say, "is that a question."  I

5   am not trying to, you know, frustrate you.

6   I just want to make sure that the record is

7   clear.  Fair enough?

8        A.    Fair.

9        Q.    Throughout the day I won't mean

10  to do so, but I will probably ask a

11  question or two that does not make sense or

12  it is a little confusing.  If that is the

13  case, I just ask that you ask me to

14  rephrase the question or clarify what I am

15  asking you.  Okay?

16       A.    Yes.

17       Q.    If you don't do that, I will

18  assume that you understood the question.

19  Fair enough?

20       A.    Ah-ha, yes.

21       Q.    Very good.  Dr. Martinez, what

22  is your current place of employment?

23       A.    I am not employed currently.  I

24  am retired.

25       Q.    And when did you retire?

1                    R. MARTINEZ
2          A.    Yes.
3          Q.    What kind of training was that?
4          A.    There was a pathways to college
5    program designed for Latino high schoolers
6    and other high schoolers as to train
7    facility (sic).
8          Q.    Where did that occur?
9          A.    By Zoom.
10         Q.    Where were the facilitators
11   located?
12         A.    In Pontiac, Michigan and I
13   don't know where some of the other ones
14   were, but they were all in Michigan.
15         Q.    What university or college were
16   you a professor of sociology?
17         A.    Michigan State University.
18         Q.    And how long did you hold that
19   position before your retirement?
20         A.    For 15 years.  I was employed
21   for 15 years there, but I was mainly an
22   administrator.
23         Q.    What were your administrative
24   responsibilities at Michigan State?
25         A.    I oversaw a research institute.

Page 12

```
 1                    R. MARTINEZ
 2   materials that you reviewed that you
 3   determined not to include in your
 4   bibliography, correct?
 5        A.    Yes.
 6        Q.    Did you rely on any of those
 7   materials that you reviewed, but did not
 8   include in your bibliography in writing
 9   your report?
10             MS. MAINOO:  Objection to form.
11        A.    I think I may have looked at
12   stuff online that led me to something else
13   that was not included.  I didn't keep a
14   record of that particular web page.
15        Q.    So is there anything that you
16   read or reviewed in your preparation for
17   your expert report, that you relied on in
18   forming your opinions, in your expert
19   report, that you have not identified in
20   your bibliography?
21             MS. MAINOO:  Objection to form.
22        A.    I don't think so.  I tried to
23   include everything that I was using for the
24   report.
25        Q.    How did you determine what to
```

Page 13

```
 1                    R. MARTINEZ
 2   include in your bibliography and what did
 3   not need to be included?
 4        A.    If it informed me as to the
 5   tasks that I had been given by the law
 6   firm.
 7        Q.    So those documents or materials
 8   that you did not include in your
 9   bibliography did not inform you about the
10   topics you were directed to write your
11   report on, correct?
12        A.    Yes.
13        Q.    Did you review any depositions
14   in your preparation of your expert report?
15        A.    No.
16        Q.    Did you interview any
17   individual people in preparing your expert
18   report?
19            MS. MAINOO:  Objection to form.
20        A.    I talked to a person in Dodge
21   City when I visited in April.
22        Q.    Anyone else that you spoke to
23   in preparing your expert report?
24            MS. MAINOO:  Objection to form.
25        A.    No.
```

1                    R. MARTINEZ

2    the substance of your expert report?

3               MS. MAINOO:  Objection to form.

4        A.    I reviewed the complaint by the

5    Plaintiff, if that's a statement.

6        Q.    Okay.  Anything else?

7               MS. MAINOO:  Objection to form.

8        A.    No.

9               MS. EBERLINE:  Counsel, can you

10          help me understand your concern about

11          the form of the question, so I could

12          try to correct that.

13               MS. MAINOO:  So I believe the

14          question was -- actually Anna, could

15          you repeat the question.

16               (Whereupon, the referred to

17          question was read back by the

18          Reporter.)

19               MS. MAINOO:  Related to the

20          substance of your expert report, that

21          is the part that I am objecting to.

22          If you want me to continue, I can do

23          that.  I just want to refrain from

24          speaking objections.

25               MS. EBERLINE:  I appreciate you

Page 25

1                    R. MARTINEZ

2        back and check.

3        Q.    Dr. Martinez, did you bring any

4    documents with you today?

5        A.    No.  Well, I brought this one

6    that I was given yesterday.

7        Q.    And you are referring to

8    Exhibit 41 in your expert report, correct?

9        A.    Yes, ah-ha.

10       Q.    Let's turn to number 2 on page

11    2 of Exhibit 40, please.

12       A.    Okay.

13       Q.    Have you written any articles,

14    papers, books or other texts, whether

15    published or unpublished that are in any

16    way related to the issues that you are

17    expressing any opinions in this case?

18            MS. MAINOO:  Objection to form.

19       A.    I wrote a chapter on the

20    demographics of Latinos in the Midwest that

21    include information on the state of Texas.

22       Q.    Did that chapter include any

23    information on Latinos in Kansas?

24       A.    Yes, basically demographics,

25    population size.

```
1                    R. MARTINEZ
2        Q.     What is the name of that
3    chapter?
4        A.     I think it's titled
5    Introduction.
6        Q.     What is the name of the book?
7        A.     Latinos in the Midwest, I
8    believe.
9        Q.     Was Latinos in the Midwest
10   published in 2011?
11       A.     Yes.
12       Q.     By the Michigan State
13   University Press?
14       A.     Yes.
15       Q.     And you drafted the
16   introduction to that book, correct?
17       A.     Yes.
18       Q.     Did you draft any chapters of
19   that book other than the Introduction?
20       A.     I believe there is a chapter on
21   politics, if I recall correctly.
22       Q.     That you drafted?
23       A.     That was co-authored with a
24   colleague and graduate student.  I believe
25   that is in that book.
```

Page 27

1                    R. MARTINEZ

2        Q.    What is the name of that

3    chapter, if you recall?

4        A.    I don't recall the title of it,

5    but it had to do with politics and Latinos

6    in some way.

7        Q.    Did you rely on your findings

8    in either the Introduction or the chapter

9    of Latinos in the Midwest in reaching your

10   conclusions in your expert report?

11              MS. MAINOO:  Objection to form.

12       A.    Not substantially, no.

13       Q.    In any way?

14       A.    I mean, it was something that's

15   in the background, it's something that I

16   thought of, but I didn't really focus on

17   it.

18       Q.    Did you review that book in

19   preparation for your report?

20       A.    I may have glanced through it.

21   It was not given the amount of review that

22   I gave other works.

23       Q.    You did not cite Latinos in the

24   Midwest as a document reviewed in

25   connection with this case, correct?

1                    R. MARTINEZ

2             MS. MAINOO:  Objection to form.

3        A.    I don't know.  I have to look

4    at it.  Are you talking about the

5    Introduction?

6        Q.    I am talking about that book in

7    any capacity.  In appendix A, starting on

8    page 16 --

9        A.    Okay.

10       Q.    You provided a list of

11   documents that you reviewed in this case,

12   right?

13       A.    Yes.

14            MS. MAINOO:  Objection to form.

15       A.    Let me see if it was listed.

16   No, it's not listed there, which means I

17   didn't really give it much attention.

18       Q.    Have you written any other

19   articles, papers or books that are related

20   to the issues on which you are expressing

21   your opinions in this case?

22            MS. MAINOO:  Objection to form.

23       A.    I would have to look through my

24   CV.  Would you like me to do that?

25       Q.    Yes, please.

1                    R. MARTINEZ

2        A.    I would say the 2017 entry,

3    Latinos' Occupational Health and Changing

4    Regulatory Context of Work would relate to

5    it, but it focused on -- necessarily on

6    meatpacking, which is the principal

7    employment in Dodge City, but it would have

8    relevance.  I didn't review it for this

9    report.

10        Q.    Any others?

11            MS. MAINOO:  Objection to form.

12        A.    I think, you know, depending on

13    what we want to establish as relevant for

14    the report.  I think the 2013,

15    Mexican-American Schoolchildren in US

16    Public School: A Review of Social Science

17    Research on Mexican American Family's

18    Cultural Capital could have relevance.  I

19    did not review it for this report.  I think

20    under F, page 28, Social and Structural

21    Inequalities and Covid-19 in the United

22    States could have relevance.  I did not use

23    it for this report.  I think on page 29,

24    2017 Introduction with colleagues to

25    Occupational Health Disparities and so on

Page 30

1                    R. MARTINEZ
2    could have relevance.  Again, I did not use
3    it for this report.  That one chapter that
4    we were talking about in terms of Latinos
5    in the midwest, on page 30 Cosas Politicas:
6    Politics, Attitudes and Perceptions By
7    Region, could have relevance.  I did not
8    review it for this report.  On page 30,
9    2010 Michigan's Mid-Term Elections and
10   Latinos in 2010 could have relevance.  I
11   did not review it for this report.  On page
12   31, 2004 entry, Race Relations in San
13   Antonio: Breaking the Silence; I did not
14   use it for this report.  I would say those
15   are the ones that I would identify at this
16   point.
17        Q.    Skipping for a moment to
18   paragraph 4 of the deposition notice.  Is
19   the CV that is included in your expert
20   report a current and accurate copy of your
21   CV?
22        A.    I think it's about a year old.
23   Since I was retiring, I was not going to be
24   reevaluated for performance.  There were
25   some presentations with a post-doc and with

Page 33

```
 1                    R. MARTINEZ
 2        Q.    Are these new reports or theses
 3   that have come out since the time that you
 4   drafted the report?
 5        A.    No, they were found after that.
 6   I believe the Johnson one was published in
 7   1985 and I can't remember when the Rutten
 8   one was published or submitted for the
 9   degree.
10        Q.    So there is no reason that you
11   could have not included those in your
12   initial report?
13        A.    I did not have them at the
14   time, so I could not include them.  I had
15   not found them.
16        Q.    You had not found them.  Did
17   you review any expert reports from any
18   other experts in this case?
19        A.    No.
20        Q.    Have you had any communications
21   with any other expert in this case?
22        A.    No.
23        Q.    Have you reviewed any documents
24   that have been produced in this case?
25        A.    No.
```

Page 36

1                    R. MARTINEZ

2   Dodge City.

3        Q.    Did you rely on information

4   that you reviewed on the Chamber of

5   Commerce website in reaching your opinion

6   in this case?

7        A.    I think when I looked at those

8   different websites, I think I have an entry

9   here that says that there has been some

10  integration in the professional level in

11  the city.  I can look it up for you, if you

12  want.

13       Q.    Yeah, I'm not sure I am

14  following.  Help me if you can, please.

15       A.    Okay.  I think it's on the

16  first summary of opinions, 1.01, where it

17  says there have only been a handful of

18  individuals from the Hispanic population

19  who serve in professional roles in local

20  government or have been elected to public

21  office.

22       Q.    And so your conclusion of that

23  is based on information that you identified

24  or reviewed on the Chambers of Commerce

25  website?

```
 1                    R. MARTINEZ
 2            MS. MAINOO:  Objection to form.
 3      A.    No, it was on the School Board
 4  and the Commission.
 5      Q.    Are there other opinions within
 6  the report that you reached based on
 7  information you reviewed on any website
 8  that is not identified in your
 9  bibliography?
10            MS. MAINOO:  Objection to form.
11      A.    Well, I included, you know,
12  some statement about Fred Rodriguez.  I
13  don't know if I provided a link to that or
14  something, where I found has an oral
15  history and then there was -- I think there
16  was an article in the daily paper.
17      Q.    There was an article in the
18  daily paper about Mr. Rodriguez?
19      A.    Yeah, there seemed to be some
20  kind of heritage movement there in Dodge
21  City by the Latino community and he
22  participated in it and granted.  I think he
23  made presentations and -- at least the
24  article said that and that may be not, he
25  was making comments about the history,
```

```
 1                    R. MARTINEZ
 2        A.     I can't remember if it's
 3   directly included in there.
 4        Q.     What website did you go to see
 5   who was on the school board?
 6        A.     The Unified School Direct 443
 7   web page.
 8        Q.     Did you rely on any information
 9   on that web page in reaching your
10   conclusions in your report?
11             MS. MAINOO:  Objection to form.
12        A.     I relied, somewhere in here it
13   says that there is not, you know, much
14   participation or inclusion in these boards
15   or commissions.  I would have to look
16   through this to find out exactly where it
17   says it.
18        Q.     But it sounds like the answer
19   is yes, that you believe you did make a
20   statement or rely on the information from
21   the school district website in reaching
22   conclusions in your report?
23             MS. MAINOO:  Objection to form.
24        A.     Yes.
25        Q.     Are there any other websites
```

Page 41

```
 1                  R. MARTINEZ
 2       A.    It would be probably the county
 3  clerk.
 4       Q.    Did you speak to someone in
 5  Ford County?
 6       A.    No.
 7             MS. MAINOO:  Objection to form.
 8       A.    By "Ford County," you mean Ford
 9  County government?
10       Q.    Yes.  Fair question.  Did you
11  speak to anybody in the Ford County
12  election unit regarding your questions
13  regarding election results?
14       A.    I did not.
15       Q.    Then how did you find the
16  election results that you reviewed?
17       A.    They are on the web page.
18       Q.    As best as you can recall, you
19  reviewed them on the Ford County website,
20  correct?
21       A.    As best as I can recall, yeah.
22  If I didn't find them there and they
23  appeared in the Dodge City website
24  somewhere, then that is where I found it.
25       Q.    But you can't tell us today,
```

Page 42

```
 1                    R. MARTINEZ
 2   one way or the other today?
 3        A.    Correct, but it is out there,
 4   they are out there.
 5        Q.    Which election results did you
 6   review?
 7        A.    I think it was the general
 8   election of 2020.  There was one in either
 9   2014 or 2009.  There is not a comprehensive
10   list for where I was at.  In other words,
11   it was not continuous.  It was kind of
12   scattered.  I think there was one in 2009,
13   maybe one in 2014 and then the one in 2022
14   general election.
15        Q.    Did you rely on the information
16   you found related to those election results
17   in reaching the conclusions in your report?
18             MS. MAINOO:  Objection to form.
19        A.    Yes, in a general sense.
20        Q.    In conducting the research
21   needed to prepare your expert report, did
22   counsel for the Plaintiff provide you any
23   documents that they asked you to review?
24             MS. MAINOO:  Objection to form.
25        A.    They provided some documents
```

1                  R. MARTINEZ

2        Q.    Have you ever worked with the

3   UCLA Voting Rights project prior to this

4   case?

5        A.    Yes.

6        Q.    Have you ever worked with the

7   ACLU prior to this case?

8        A.    No.

9        Q.    Where did you grow up?

10       A.    In northern New Mexico, Taos

11   County.

12       Q.    I believe you mentioned earlier

13   that -- well, I'm not sure if you

14   mentioned.  Have you ever been to Dodge

15   City, Kansas?

16       A.    I was there in early April of

17   this year.

18       Q.    Was that the first time that

19   you had been to Dodge City?

20       A.    Yes, although I have driven

21   across Kansas and if I drove through there,

22   on Interstate 50, it doesn't register.

23       Q.    Have you ever lived in the

24   state of Kansas?

25       A.    I have not.

```
 1                    R. MARTINEZ
 2        Q.    Have you ever spent any
 3   substantial time in Kansas?
 4              MS. MAINOO:  Objection to form.
 5        A.    No, I have not.
 6        Q.    Prior to your engagement in
 7   this case, had you ever conducted any
 8   research on the city of Dodge City?
 9        A.    I have not.
10        Q.    Had you ever conducted any
11   research on the state of Kansas?
12              MS. MAINOO:  Objection to form.
13        A.    Just the demographic work that
14   I mentioned earlier.
15        Q.    And what demographic work was
16   that?
17        A.    That was contained in the
18   introductory chapter of Latinos in the
19   Midwest where I provided the demographic
20   overview of Latinos in the Midwest,
21   particularly Kansas.
22        Q.    In your expert report you
23   state, "my work has centered on
24   institutional racial features in different
25   sectors of society."  Can you help me
```

Page 50

                    R. MARTINEZ
1
2    who have a very broad of view of society,
3    American society, let's say for example.
4    So what we do is we study the structure and
5    dynamics of a society.  Within that, I look
6    at intergroup relations, particularly with
7    regard to race relations.  So if I am
8    looking at the history of a subordinated
9    group in society, I tend to look at both
10   what is happening at the individual level,
11   but also what is happening in terms of the
12   institutionalized practices.  So it depends
13   what I am looking at a particular point in
14   time.
15        Q.    Would you agree with me that
16   you have not focused your career on a study
17   of Dodge City?
18        A.    I would agree with that.
19        Q.    Would you agree that you have
20   not focused your career on the study of
21   Kansas?
22        A.    I would agree with that.
23        Q.    Prior to your engagement in
24   this case, did you have any specialized
25   knowledge regarding the history in Dodge

```
 1                    R.  MARTINEZ
 2    City?
 3              MS.  MAINOO:   Objection to form.
 4        A.    Not  specifically.
 5        Q.    And prior  to your  engagement  in
 6    this case,  did  you  have  any specialized
 7    knowledge regarding  the  state  of  Kansas'
 8    history?
 9              MS.  MAINOO:   Same  objection.
10        A.    Other  than  having  read  a  book
11    on the Earps by Frank Waters,  who  wrote  a
12    book  on  the Earps  through  interviews with
13    the  widow  of  one  of  them.
14        Q.    When  you  refer  to  the  Earps,
15    you are referring  to  the  Earp  brother,
16    Wyatt  Earp?
17        A.    Yes.
18        Q.    I don't recall  Wyatt's
19    brother's  name.
20        A.    I  don't  either.
21        Q.    The  lesser  known  Earp.
22        A.    Ah-ha.
23        Q.    Is  what  you  learned  from  the
24    book about  the  Earps  by Frank  Waters  the
25    extent  of  your  knowledge  of  the  state  of
```

```
 1              R. MARTINEZ
 2   Kansas' history prior to your engagement in
 3   this case?
 4        A.    I would say the state of
 5   knowledge of Dodge City.  I don't know that
 6   it would inform me about the state of
 7   Kansas, per se.
 8        Q.    Is there any other basis for
 9   any specialized knowledge that you have
10   regarding the state of Kansas' history
11   prior to your engagement in this case?
12             MS. MAINOO:  Objection to form.
13        A.    Well, I knew that it was a
14   state of contestation between abolitionists
15   and post-slavery forces.  I knew that the
16   Jayhawkers were active in Kansas.  I knew
17   other things like that about Kansas and I
18   knew about the activities and police views
19   of the current attorney general in Kansas.
20        Q.    Which attorney general is that
21   that you are referring to?
22        A.    Oh, I am trying to remember his
23   name, but it's basically his
24   anti-immigration views.
25        Q.    Are you referring to Kris
```

1                    R. MARTINEZ

2    Kobach?

3        A.    Yes.  And I think he was in

4    other positions before that, before he

5    became an attorney general.  Kris is well

6    known.

7        Q.    Other than what you have

8    shared, do you have any other prior

9    knowledge regarding the state of Kansas'

10   history before engagement in this case?

11            MS. MAINOO:  Objection to form.

12       A.    I don't think so.  It would

13   have just been general knowledge of some

14   sort.  I mean, I knew that the Santa Fe

15   Trail went through Kansas.

16       Q.    Tell me about your trip to

17   Dodge City in April of 2023, how many days

18   were you there?

19       A.    I think I arrived on a

20   Wednesday and left on a Friday.

21       Q.    Did you conduct any interviews

22   while you were there?

23            MS. MAINOO:  Objection to form.

24       A.    I conducted one informal

25   interview.

Page 54

```
 1                   R. MARTINEZ
 2         Q.    Who did you speak to?
 3         A.    I didn't take down his name.
 4   It was a Mexican immigrant who had retired
 5   from one of the meatpacking plants.  I
 6   mention him in the report.
 7         Q.    I recall reading that.  You
 8   don't know his name?
 9         A.    We didn't share names.  We were
10   talking more about, you know, his life in
11   Dodge City.  I stopped to ask him
12   directions for a good Mexican restaurant.
13         Q.    Did he have a good
14   recommendation?
15         A.    He had a great recommendation.
16   I went there.
17         Q.    How long was your conversation
18   with this individual?
19         A.    I think it was about 45
20   minutes, something like that.
21         Q.    Did you take notes?
22         A.    I don't think so.  I mean, I
23   went to the restaurant after that.  I did
24   later recall what our conversation was to
25   enter it as I was drafting the report.
```

Page 56

```
 1                    R. MARTINEZ
 2   Boulevard and I drove up 14 to the food
 3   store.  So I kind of knew the lay of the
 4   land, so to speak.
 5        Q.    Approximately how long of a
 6   drive is it from the south side of town to
 7   the food store on the north side of town?
 8             MS. MAINOO:  Objection to form.
 9        A.    I don't know, if you want to
10   speculate, I'd say, you know, seven minutes
11   or so or more.
12        Q.    Do you recall anything else
13   about this individual that you spoke to?
14        A.    I recall that he told me what
15   he was earning per hour when he retired,
16   which, as I recall, was about $12 an hour
17   and that he thought the workers were
18   getting paid more at that moment, at that
19   time.
20        Q.    When did he retire?
21        A.    I think he had been retired for
22   maybe a couple of years, not very long.
23        Q.    Did he tell you where he lived?
24        A.    What do you mean by that, where
25   he lived in Dodge City?
```

Page 57

1              R. MARTINEZ

2        Q.    Yes.

3              MS. MAINOO:  Objection to form.

4        A.    I found him at his home.  He

5    was outside in the yard, working on his

6    truck.

7        Q.    What street were you on?

8        A.    I don't recall.  It's somewhere

9    around what they call Trail something,

10   which is on the south side of town.

11       Q.    Did he tell you anything about

12   his family?

13       A.    Yes, he talked about his

14   family.  He is from -- originally from

15   Mexico, wanted to move back, but his kids

16   were here.  He had -- I don't know how many

17   kids he had because they all went to school

18   there.  He had been a migrant worker in

19   Colorado, up in the Greeley area.

20       Q.    Did he tell you how long he

21   lived in Dodge City?

22       A.    I think he did, although I

23   don't recall exactly, but it was in my mind

24   of vague recollection, is probably

25   somewhere around 15 years or something,

```
 1                    R. MARTINEZ
 2    of the requirements.
 3         Q.    Voting Acts had not been an
 4    area of focus for your scholarly research,
 5    is that correct?
 6         A.    That's correct.
 7         Q.    Did you conduct any research on
 8    the elements required to establish a Voting
 9    Rights Act violation in preparation for
10    your report?
11              MS. MAINOO:  Objection to form.
12         A.    I reviewed section 2 of it and
13    then I reviewed the Arlington Heights
14    criteria.
15         Q.    What was the source of
16    information that you used to review section
17    2 of the Voting Rights Act?
18         A.    The web page.
19         Q.    What web page?
20         A.    I don't know.  It just went to
21    it.  It just had that one part.  I just put
22    in something like that, Voting Rights
23    section 2 and it takes you to really --
24    about, you know, less than a page, I think.
25         Q.    You just Googled section 2,
```

Page 67

```
1                    R. MARTINEZ
2   Voting Rights Act and whatever popped up?
3        A.    Yes.  I deemed it was
4   comprehensive.  That that whole section was
5   there.  I don't know if it was or not.
6        Q.    You don't know one way or the
7   other whether the whole section was there,
8   is that what you said?
9        A.    Right.
10        Q.    What was the source of
11   information you used to learn of the
12   Arlington Heights criteria?
13        A.    I think I Googled that under
14   Arlington Heights criteria.
15        Q.    How did you know to Google
16   Arlington Heights criteria?
17              MS. MAINOO:  Objection to form.
18        A.    It either came up in the
19   materials I was reviewing, there was a case
20   over in California that may have mentioned
21   it.  Watsonville, maybe, something like
22   that.  I reviewed that and maybe section 2.
23        Q.    Did you review the opinions
24   from the Arlington Heights and Watsonville
25   cases?
```

1                    R. MARTINEZ

2              MS. MAINOO:  Objection to form.

3       A.    I don't believe so.

4       Q.    And the Voting Rights Act has

5   not been a primary focus of your research

6   or scholarship, correct?

7              MS. MAINOO:  Objection to form.

8       A.    That's correct.

9       Q.    Prior to being retained in this

10  case, had you conducted any research or

11  scholarship regarding the effects of the

12  at-large voting systems?

13             MS. MAINOO:  Objection to form.

14      A.    I did not.  I knew about it and

15  it would show up in materials that I would

16  read, but I had not conducted research.

17      Q.    You had not conducted research

18  on how an at-large voting system compared

19  to a multidistrict setting voting system

20  with respect to election results, correct?

21      A.    Can you restate that?

22      Q.    I will try again.  I'm not sure

23  what I asked.  Before being retained in

24  this case, had you studied the impact of

25  at-large voting systems versus

Page 71

1                    R. MARTINEZ
2     multidistrict voting systems on any
3     specific population?
4          A.    No.
5          Q.    And you had not studied the
6     impact on how likely individuals of a
7     certain raise or ethnicity would be to be
8     elected under either voting system,
9     correct?
10         A.    Correct.
11         Q.    That has not been a primary
12    area of your research or scholarship,
13    correct?
14         A.    Correct.  Can we take a quick
15    break.
16         Q.    Yes.
17              MS. EBERLINE:  Off the record.
18              (Whereupon, a short recess was
19         taken.)
20         Q.    Dr. Martinez, when you were in
21    Dodge City, did you happen upon a Hispanic
22    grocery store in south Dodge?
23         A.    I don't recall.
24         Q.    You don't know one way or the
25    other whether or not there is a grocery

                        R. MARTINEZ

1    force for the economy of Dodge City, is the
2    first part of that, for their labor and
3    then they have not been included in
4    substantial numbers in the representation,
5    in elected office, let's say, as an
6    example.
7        Q.    What is the basis for your
8    conclusion that Mexicans, which I think is
9    what you are referring to here, have not
10   been included in substantial numbers in
11   elected office in Dodge City?
12       A.    Looking at the election results
13   and those who have been elected to office
14   over time and keeping in mind the
15   proportion of the population that they
16   constitute in Dodge City.
17       Q.    Did you do any statistical
18   analysis or was that an overall opinion?
19                MS. MAINOO:  Objection to form.
20       A.    I didn't do any statistical
21   analysis.  I mean, the numbers, you really
22   cannot do any statistical analysis, like if
23   you have one of them on the board or two of
24   them on the board.  I did not look at the

Page 78

1                    R. MARTINEZ

2    precincts and all the writings, all the

3    voting patterns or so on.

4         Q.    In the next sentence there,

5    "there has only been a handful of

6    individuals from the Hispanic population

7    who served in professional roles in local

8    government or have been elected to public

9    office."  What did you review to reach that

10   conclusion?

11        A.    Basically, you know, the web

12   page of Dodge City, the Commission web

13   pages, the school board web page and so on.

14   Again, getting back to, you know, some of

15   the election results that we talked about

16   earlier.

17        Q.    But you refer to professional

18   roles in local government, are you talking

19   about elected positions or hired positions?

20        A.    Hired.

21        Q.    What data did you review to

22   reach your conclusion about hired positions

23   within the city of Dodge City?

24        A.    I looked at the City Manager's

25   Office.  I looked at some of the staff

```
 1                   R.  MARTINEZ
 2   pages  for  the  school  district.
 3        Q.    Did  you  do  any  comprehensive
 4   review  of  the  racial  or  ethnic  background
 5   of  the  employees  of  the  city  of  Dodge  City
 6   in  reaching  this  conclusion?
 7              MS.  MAINOO:   Objection  to  form.
 8        A.    Say  that  again.
 9              MS.  EBERLINE:   Can  you  read  it
10         back.
11              (Whereupon,  the  referred  to
12         question  was  read  back  by  the
13         Reporter.)
14              MS.  MAINOO:   Same  objection.
15              MS.  EBERLINE:   Let  me  rephrase
16         it  just  a  little  bit.
17        Q.    Did  you  review  any
18   comprehensive  report  reflecting  the  race  or
19   ethnicity  of  the  employees  of  the  city  of
20   Dodge  City  in  reaching  your  conclusions?
21        A.    I  don't  know  what  constitutes
22   comprehensive,  but  I  looked  at  those  whom  I
23   thought  might  be  Latinos  on  the  Board  or  on
24   the  Commission.
25        Q.    But  I  am  talking  about  hired
```

```
 1              R. MARTINEZ
 2    employees, do you have any idea of the
 3    racial composition of hired employees
 4    within the city of Dodge City?
 5         A.    Well, the city manager is a
 6    hired employee.  Is he a Latino from what I
 7    could tell.
 8         Q.    Did you do any review of any
 9    employees outside of the City Manager's
10    Office within the city of Dodge City?
11              MS. MAINOO:  Objection to form.
12         A.    I didn't.  It's not available
13    readily and I didn't ask for it and there
14    was De La Rosa who apparently, was like
15    started out in that office and rose to
16    Deputy City Manager and then left.
17         Q.    What is the source of your
18    information about Mr. De La Rosa?
19         A.    Included in the web pages.
20         Q.    So that is additional
21    information that you saw on the city of
22    Dodge City website?
23         A.    I believe so.
24         Q.    So you did not have available
25    to you any information with respect to the
```

Page 81

1                    R. MARTINEZ

2    demographic, ethnic or racial breakdown of

3    the city of Dodge City employees, correct?

4             MS. MAINOO:   Objection to form.

5         A.    That is correct.

6         Q.    So when you say there has only

7    been a handful of individuals from the

8    Hispanic population who serve in

9    professional roles and local government,

10   you didn't have complete data to reach that

11   conclusion, correct?

12        A.    I am not talking about any or

13   all Latinos employees.  The key word there

14   is professional.

15        Q.    Okay.

16        A.    By that I would mean someone

17   who is in a visible administrative position

18   or with a certain level of expertise.  I am

19   sure that they have employees in other

20   areas, but I would not necessarily say that

21   every employee of the city is a

22   professional employee.

23        Q.    Okay.  So which positions

24   within the city of Dodge City are you

25   referring to as professional roles?

```
 1                     R. MARTINEZ
 2        Q.    And would the same be true with
 3   respect to the school district?
 4        A.    Correct, you know, there are
 5   some -- one would say that a teacher is a
 6   professional, but I didn't know how many
 7   Latino teachers there are or Latina
 8   teachers there are.
 9        Q.    So your opinion is not -- you
10   are not giving an expert opinion with
11   respect to the percentage of teachers in
12   the city of Dodge City that are of any
13   given race or ethnicity, correct?
14        A.    Right.
15        Q.    Next you say that "the
16   demographic shift that has occurred in
17   recent decades has likely engendered a
18   perception of threat to political power
19   among white Dodge citizens who are
20   interested in retaining their dominant
21   political position in the City."  Do you
22   see that?
23        A.    Yes.
24        Q.    What is the basis for that
25   opinion?
```

1              R. MARTINEZ

2       A.    There is a view in the body of

3  literature of race relations that the

4  dominant group is not likely to feel

5  threatened when the numbers of the

6  subordinate group are relatively low, but

7  when they increase, as they have

8  substantially in Dodge City, there is the

9  likelihood that members of the dominant

10 group will feel threatened, relevant to the

11 status culture and so on.  And Dodge City

12 has those -- that pattern, in terms of,

13 large numbers of members of the subordinate

14 group, who are now white Dodge citizens,

15 are the numeric minority.  I want to be

16 clear, a numeric minority, not a social

17 minority.

18      Q.    I think you stated that there

19 is a view in the literature that describes

20 that threat.  What -- are you referring to

21 any particular author or studies when you

22 say that view exists?

23      A.    This is just, sort of, my

24 expertise in the field of race relations.

25 I could, you know, refer you to the work,

1                    R. MARTINEZ

2    threat on the part of members of the

3    dominant group.  I think they call it

4    replacement theory or something like that,

5    fear of being replaced, "you will not

6    replace us" we see in some of the marches

7    that they have and so forth.  I think if we

8    look at what is going on nationally in

9    Kansas and in Detroit, they are not an

10   island onto themselves.  They, like all

11   other states and localities, tend to

12   reflect much of what is going on at the

13   national level.

14        Q.    Other than Mr. Turner and

15   Singleton, can you cite any other

16   authorities on these theories?

17             MS. MAINOO:  Objection to form.

18        A.    Not right now.  I think you

19   could find it in the field.

20        Q.    But it's not reflected in your

21   bibliography, correct?

22        A.    No, this comes from my

23   understanding, my expertise in the field of

24   race relations.

25        Q.    During your time at Dodge City,

Page 87

```
 1                    R. MARTINEZ
 2    did you learn anything that suggested that
 3    that theory is applicable in Dodge City?
 4              MS. MAINOO:  Objection to form.
 5         A.    I think that knowing the
 6    numbers and looking at the city and where
 7    people were living and the changes that
 8    have occurred demographically, knowing that
 9    I did not, you know, talk to anyone or find
10    anything specifically, that is a direct
11    evidence.
12         Q.    In other words, that statement
13    about the likely engendering of a
14    perception of threat to a political power,
15    that is a statement that you have made
16    based on your work as a sociologist,
17    correct?
18              MS. MAINOO:  Objection to form.
19         A.    Yes.
20         Q.    And you have extrapolated that
21    statement and applied it to the city of
22    Dodge City, correct?
23              MS. MAINOO:  Objection to form.
24         A.    Yes.
25         Q.    And you agree that you didn't
```

1                    R. MARTINEZ
2    find any specific evidence in Dodge City
3    that that is applicable in Dodge City,
4    correct?
5             MS. MAINOO:  Objection to form.
6        A.    I did not talk to people.  I
7    did not do a study of looking for evidence
8    of that sort.  That would have to be a
9    study that was done, but the conditions are
10   there.
11       Q.    And those conditions you are
12   referring to are the demographic conditions
13   of the growth of the Hispanic population in
14   Dodge City, correct?
15            MS. MAINOO:  Objection to form.
16       A.    Yes, and that white members of
17   that community are now a numeric minority.
18       Q.    Is there anything else on which
19   you base that conclusion?
20       A.    No, I think not.
21       Q.    Would you agree that that
22   statement is speculative with respect to
23   the city of Dodge City?
24       A.    I would agree that it is my
25   expert opinion that that is the case.

```
 1                    R. MARTINEZ
 2   remember the term that would -- what is it?
 3   It will come to me.
 4        Q.    The next sentence refers to
 5   meatpacking as "a highly competitive
 6   industry and companies keep wages and
 7   benefits to a minimum," do you see that?
 8        A.    Yes.
 9        Q.    Is the source of that
10   conclusion the Stull and Broadway article
11   that is listed there from 1995?
12        A.    Yes.
13        Q.    Do you have any specific
14   information with respect to any change in
15   compensation within the meatpacking
16   industry from 1995 until the present?
17        A.    No, I do not.
18        Q.    Did you do any analysis of
19   wages at meatpacking plant in Dodge City
20   specifically?
21        A.    I did not.
22        Q.    Did you conduct any research on
23   how wages in meatpacking plants compared to
24   other employment in western Kansas?
25        A.    I did not, but this is an area
```

1                    R.  MARTINEZ

2    which is receiving considerable amount of

3    research by scholars.

4         Q.    Did you review any of that

5    research by scholars in preparation of your

6    report?

7         A.    I reviewed Stull the Broadway

8    and I think there was one by Lourdes

9    Gouveia.

10        Q.    Could you spell the last name

11   for us, please?

12        A.    G-O-U-E-V-E-I-A or something

13   like.  I think she wrote it with Stull.  It

14   might be with Stull as the primary author,

15   something about dancing with cows.

16        Q.    Yeah, I see it in here.  Stull

17   and Gouveia, Dances With Cows.  Did either

18   of those articles that you mentioned or any

19   of those articles that you mentioned

20   provide any analysis of wages in

21   meatpacking plants in Dodge City?

22        A.    I don't recall that they did an

23   analysis.  They characterized it, so I am

24   not sure what their sources are.  I think

25   Stull is one of the preeminent scholars in

Page 99

1                       R.  MARTINEZ
2    the study of meatpacking, Stull and
3    Broadway.
4          Q.    Did you conduct any review or
5    analysis of economic impact on meatpacking
6    plants in Dodge City?
7                MS.  MAINOO:  Objection to form.
8          A.    No.
9          Q.    And would you agree that these
10   conclusions in paragraph 3.08 are general
11   conclusions with respect to the meatpacking
12   industry overall?
13         A.    Yes.
14         Q.    And those general statements
15   may or may not apply in Dodge City, Kansas,
16   correct?
17         A.    Of 3.08?
18         Q.    Yes, sir.
19         A.    I think it would be reasonable
20   to expect that they do apply.
21         Q.    Based on what?
22         A.    That the studies have been
23   conducted on these plants in the triangle
24   area.
25         Q.    You are referring to the Stull

Page 103

1                    R. MARTINEZ
2    continue to do so.
3         Q.    Let's look at 3.13, you
4    reference here an instance of a Mexican
5    Dodge City shooting and killing one white
6    man and wounding another, correct?
7         A.    Yes.
8         Q.    This occurred in 2009?
9         A.    Yes.
10        Q.    Are you providing this as an
11   example or discrimination against the
12   Mexicans in Dodge City?
13        A.    I am providing it as an
14   indicator that a reporter on that case was
15   provided information by an informant that
16   one of them was known to have anti-Hispanic
17   views, that the person also maintained some
18   supply of semiautomatic weapons and that
19   there may be a racial undercurrent of
20   anti-Hispanic sentiments.
21        Q.    You're basing that suggestion
22   that there may be a racial undercurrent on
23   the information provided by the reporter in
24   this -- reflecting this criminal action,
25   correct?

```
 1                      R. MARTINEZ
 2   was hard to find.
 3        Q.    Do you recall, in the New
 4   Yorker article, the author stating that
 5   local leaders in the Hispanic community
 6   seemed intent on taking steps to turn the
 7   situation into peaceful coexistence and
 8   turn the distrust into trust?
 9        A.    I don't recall that at this
10   moment, but if you show me the article I
11   can confirm that it is in there, but it's
12   not surprising.
13        Q.    What would you mean when you
14   say "it's not surprising"?
15        A.    Well, it seems like the
16   incident created some strong reactions and
17   if there is a -- if there is hostility that
18   is dividing the population the issues that
19   people, leaders would want to peacefully
20   resolve them.  Is there a specific page?
21             (Whereupon, document was marked
22         as Defendants' Exhibit 42 for
23         identification as of this date by the
24         reporter.)
25        Q.    So I have handed you Exhibit 42
```

Page 109

```
 1                    R. MARTINEZ
 2   agree?
 3        A.    Absolutely.  And hopefully,
 4   they did.
 5        Q.    You would agree that this event
 6   involving three private individuals is not
 7   evidence of official discrimination in
 8   Dodge City, correct?
 9             MS. MAINOO:  Objection to form.
10        A.    Yes.
11             MS. EBERLINE:  Let's take a
12        break.
13        A.    I'm sorry.
14             MS. EBERLINE:  Let's take a
15        break and go off the record.
16             (Whereupon, a short recess was
17        taken.)
18        Q.    Dr. Martinez, let's look at
19   3.14?
20        A.    The bottom of page 4?
21        Q.    Yes, sir.  You state that Dodge
22   City promotes the National Day of the
23   Cowboy?
24        A.    Ah-ah.  Yes.
25        Q.    Then you say it says a
```

Page 121

1                     R. MARTINEZ
2              (Whereupon, the referred to
3          answer was read back by the
4          reporter.)
5         Q.    Let's look at paragraph 3.16.
6    This is a paragraph that refers to
7    Coronavirus spread in 2020, correct?
8         A.    Yes.
9         Q.    Did you agree about the
10   decision about who was to receive the first
11   vaccine was not a decision that was made by
12   the city of Dodge City officials?
13        A.    I don't know that.  I don't
14   know that they were not involved in
15   deciding or influencing who would be
16   receiving the vaccine.
17        Q.    You don't know one way or the
18   other about who made those decisions,
19   correct?
20        A.    At the local level, no.
21        Q.    Do you have information about
22   who made those decisions at any level?
23        A.    I think the CDC was providing
24   direction.
25        Q.    So you just don't know one way

1             R. MARTINEZ

2    or the other about who decided which groups

3    of people within the city of Dodge City

4    were to receive the first vaccine, correct?

5         A.    Yes.

6         Q.    That is true at the state level

7    as well, correct?

8         A.    I don't know about the state

9    level.

10        Q.    You don't know one way or the

11   other?

12        A.    About the state level.  My

13   point here is that you have a city that is

14   highly dependent on a segment of the labor

15   force that is critical to the food systems

16   and who were categorized as essential

17   workers and who were getting sick with the

18   virus.  And when the vaccination or the

19   vaccine came out, they were not targeted

20   for early vaccination.

21        Q.    What is the source of that

22   conclusion?

23        A.    I don't recall where I found

24   that.

25        Q.    Is it cited in your

Page 123

```
1                    R. MARTINEZ
2    bibliography in a way that you can locate
3    it?
4         A.    I don't know if I had included
5    it there, I would be able to reference it,
6    but it's taken from a study or a document.
7         Q.    But you can't point us to which
8    study or document that is, correct?
9         A.    Correct, not at this time.
10        Q.    You mentioned that if you had
11   included it in 3.16 we could jump right to
12   it.  When you prepare papers for
13   publication, did you cite to your
14   conclusions or opinions within the document
15   itself?
16             MS. MAINOO:  Objection.
17        Q.    Typically?
18             MS. MAINOO:  Objection to form.
19        A.    Typically.
20        Q.    So if this would be a
21   peer-reviewed article, a statement like
22   3.16 would be cited to a source, correct?
23             MS. MAINOO:  Same objection.
24        A.    Say that again, please.
25        Q.    If your expert report, Exhibit
```

Page 124

```
 1                    R. MARTINEZ
 2   41, were to be a peer-reviewed publication,
 3   conclusions like those in 3.16 would be
 4   cited specifically to a source, correct?
 5            MS. MAINOO:  Same objection.
 6      A.    Yes, quite likely.
 7      Q.    And that would enable the
 8   reader to go read that source?
 9      A.    Right.
10      Q.    And determine whether your
11   description of it is accurate or whether
12   the reader agrees with it, right?
13      A.    Correct.
14      Q.    Based on your lack of
15   information about who made the decisions at
16   the state level or the local about who
17   received the first vaccine, would you agree
18   that 3.16 is not evidence of official
19   discrimination by the city of Dodge City?
20            MS. MAINOO:  Objection to form.
21      A.    I would agree that the city was
22   not engaged in official discrimination.
23      Q.    Three point one seven, please.
24      A.    Okay.
25      Q.    The first paragraph or sentence
```

1                    R. MARTINEZ
2          Q.    And so his experience is the
3    only one that you have heard firsthand,
4    correct?
5          A.    Yes.
6          Q.    You mentioned in here that he
7    complained of the brick-paved streets in
8    Dodge City, do you see that?
9          A.    Yes.
10         Q.    Do you recall that
11   conversation?
12         A.    Yes.
13         Q.    What did he tell you about the
14   brick-paved streets?
15         A.    Basically said that they were
16   rough and implied that paved, you know,
17   with cement or concrete or some other form
18   would be better.  I think he felt that it
19   was -- I am stating what I took from it,
20   that they were not experiencing, you know,
21   a lifestyle that others were, that had
22   those other, smoother roads, let's say.
23         Q.    The brick-paved streets that he
24   referred to, are those that are just north
25   and east of Dodge City's historic downtown,

```
 1                  R. MARTINEZ
 2    correct?
 3         A.    Yes.
 4         Q.    Do you know whether those
 5    streets are within the boundaries of Dodge
 6    City's historic downtown?
 7         A.    The brick ones?
 8         Q.    Yes, sir.
 9         A.    I believe they are.
10         Q.    Did you do any research or do
11    you know personally whether there are
12    restrictions on changes to those streets
13    due to the historic designation?
14         A.    I don't know -- no, I did not,
15    but I don't know what the boundaries are
16    because if you continue to go east, what I
17    found was that those brick roads went into
18    the residential areas.
19         Q.    You don't have any personal
20    knowledge about what restrictions there may
21    be within the city with respect to brick
22    roads, correct?
23         A.    No.
24         Q.    Is that correct?
25         A.    That is correct, yes.
```

1                    R. MARTINEZ

2        Q.    Do you have any information

3   with respect to how the city prioritizes

4   street repair within the city of Dodge

5   City?

6        A.    I did not look into that.

7        Q.    You are aware of whether the

8   city has a street plan that described that

9   prioritization?

10        A.    I am not aware that they have a

11   plan.

12        Q.    You don't know one way or the

13   other, correct?

14        A.    Correct.

15        Q.    You are aware of the factors

16   that are considered by the city of Dodge

17   City in determining which roads to pave and

18   with what materials?

19        A.    I do not.

20        Q.    Do you agree that cities have

21   limited resources and have to make

22   difficult decisions about prioritization on

23   things such as road repairs?

24        A.    I think it varies from city to

25   city.

Page 142

1                     R. MARTINEZ

2        Q.     Would you agree that this

3    individual, personal opinion about the

4    streets in Dodge City is not evidence of

5    official discrimination in Dodge City?

6        A.     I would agree it's not evidence

7    of official discrimination, by that,

8    meaning that there is not a policy that

9    says that they would not pave those roads

10   because Mexicans lived in those areas.

11       Q.     Right.  And that's what you

12   told me you were asked to analyze, the

13   history of official discrimination,

14   correct?

15       A.     Correct, and the history of

16   race relations.

17       Q.     Prior to being engaged as an

18   expert in this case, did you have expertise

19   on housing segregation?

20            MS. MAINOO:  Objection to form.

21       A.     What do you mean by expertise?

22       Q.     Had you previously researched

23   the topic of housing segregation before

24   being engaged in this case?

25       A.     I know of practices of

Page 143

1                    R. MARTINEZ
2    redlining that have taken place in cities
3    where there were informal practices, too,
4    of not selling to certain populations and
5    so on.
6        Q.    Is that a topic of scholarly
7    research that you engaged in throughout
8    your career?
9        A.    What do you mean by research?
10   Is it empirical research or is it a review
11   of research that has been conducted?
12       Q.    Either.
13       A.    I have not done empirical
14   research, but I have reviewed studies that
15   have done that.
16       Q.    You reviewed other people's
17   work with respect to having housing
18   segregation over the course of your career,
19   correct?
20       A.    Yes.
21       Q.    Do you consider yourself an
22   expert in housing segregation?
23       A.    I believe that there are others
24   who have done research that would be more
25   focused, researchers and experts on it, but

Page 144

1                    R. MARTINEZ
2    I do not discount my knowledge of it.
3         Q.    Three point two zero, you
4    describe that "Mexicans arrived in Dodge
5    City early in the 20th century to work on
6    the railroad.  They were housed in company
7    housing made of railroad ties and wood
8    scraps."  Do you see that?
9         A.    Yes.
10        Q.    Is it your testimony that the
11   workers for the railroad were required to
12   live within the Mexican village?
13              MS. MAINOO:  Objection to the
14          form.
15        A.    It is my view that it was an
16   informal practice to have them live in
17   those houses.
18        Q.    This was employer-provided
19   housing, correct?
20        A.    Yes.
21        Q.    But the employees of the
22   railroad could choose to accept that
23   employer-provided housing or they could
24   choose to live also within the city off
25   paychecks, correct?

Page 151

1                    R. MARTINEZ

2              MS. MAINOO:  Objection to form.

3        A.    I would agree that they were

4    looking at different aspects of the village

5    and that if we take only Wenzl's, we don't

6    take the full picture.

7        Q.    And that would be true of Mr.

8    Franco and Johnson as well?

9        A.    That's correct.

10        Q.    In 3.22, you state here that

11    Dodge City has restrictive covenants in

12    housing sales, do you see that?

13        A.    In 3.22?

14        Q.    Yes, sir.

15        A.    Yes.

16        Q.    And Dr. Martinez is your

17    authority for that conclusion, correct?

18        A.    Yes.

19        Q.    Did you do any research to --

20    let me start again.  Did you review any

21    actual restrictive covenants in housing

22    sales that existed at any time in the city

23    of Dodge City?

24        A.    I did not.

25        Q.    And so do you know what those

Page 152

```
 1              R.  MARTINEZ
 2  restrictive  covenants  prohibited?
 3      A.    I do not.   This is a reference
 4  by this particular author and that is all I
 5  know.
 6      Q.    Mr. Martinez, in his article,
 7  indicated that the restrictive covenants
 8  went away after the Civil Rights Act of
 9  1965.  Do you recall that?
10      A.    I don't know that they went
11  away completely or that they did not
12  continue or that they may have continued
13  the informal practices.
14      Q.    You don't know one way or the
15  other about any of those things, correct?
16      A.    Correct.
17      Q.    And you are not familiar with
18  when they were eliminated?
19      A.    I am not.
20      Q.    And you are not familiar with
21  whether they did continue it in an informal
22  way?
23          MS. MAINOO:  Objection to form.
24      A.    I don't know when they were
25  eliminated, if they were eliminated
```

1                        R. MARTINEZ

2    completely or if they existed as Martinez

3    states, but, you know, he is a scholar and

4    that is what he stated.  I don't know that

5    informal practices were not in existence

6    and I don't have any evidence that they

7    continue as informal practices.

8         Q.    You state in the second

9    sentence, the 3.22, that housing in Dodge

10   City remains highly segregated white

11   residents concentrated in the northern part

12   of the city and Hispanics in the southern

13   part of the city.  What is the basis for

14   that statement?

15        A.    My driving around the city and

16   looking at residents and people in those

17   sections of the city and it was very clear

18   to me that in the southeast side of the

19   city is where the Latinos are living and in

20   the north side of the city, which I was

21   kind of surprised at how far north it

22   extends, it extended, it was primarily

23   white people.

24        Q.    What do you mean when you were

25   surprised how far north it extended.  Like

Page 154

1                     R. MARTINEZ

2    how far north what extended?

3         A.    The city itself or the

4    residents of the population.

5         Q.    In other words, the city was

6    larger, geographically, than you expected?

7         A.    Well, I had no expectations,

8    but as I kept driving north it just kept

9    going.

10        Q.    So the basis for your

11   conclusion that housing in Dodge City

12   remains highly segregated is based on your

13   personal experience driving around,

14   correct?

15        A.    And making observations, yes.

16        Q.    You didn't review any data or

17   census tracts to reach that conclusion,

18   correct?

19        A.    No.

20        Q.    That's correct?

21        A.    That is correct, yes.

22        Q.    Do you have any information

23   about the integration of housing today

24   versus 20, 30 or 40 years ago?

25                MS. MAINOO:  Objection to form.

```
 1                    R. MARTINEZ
 2       A.    I don't.
 3       Q.    Do you have any information
 4  about what steps the city is taking
 5  presently, if any, to address
 6  discrimination housing?
 7       A.    I don't.
 8       Q.    Do you have any evidence that
 9  suggests the city is currently
10  discriminating in housing?
11            MS. MAINOO:  Objection to form.
12       A.    The city as a governance unit?
13       Q.    Yes, sir.
14       A.    No.
15       Q.    Is it your understanding that
16  restrictive covenants existed in many
17  cities throughout the country?
18       A.    Yes.
19       Q.    And that, historically, housing
20  discrimination has been a challenge?
21       A.    Has been a feature of race
22  relations in this country, yes.
23       Q.    So that history is not new to
24  Dodge City or to the state of Kansas,
25  correct?
```

Page 166

```
 1              R. MARTINEZ
 2   have you provided any testimony in your
 3   report that reflects current discrimination
 4   by the city of Dodge City?
 5              MS. MAINOO:  Objection to form.
 6       A.    I did not find current
 7   documents that attest to that, but also
 8   these aspects are greatly understudied in
 9   both Dodge City and in Kansas.
10       Q.    And other than the denial of
11   access to some of the public accomodation
12   prior to the Civil Rights Act, did you find
13   any form of official discrimination
14   historically in the city of Dodge City?
15              MS. MAINOO:  Objection as to
16        form.
17       A.    I did not, not as a policy by
18   the city.
19              MS. EBERLINE:  Off the record.
20              (Whereupon, an off-the-record
21        discussion was held.)
22       Q.    Let's talk to section 4 of your
23   report, which is entitled History of
24   Discrimination in Kansas.  Is this a topic
25   that you've published any articles on
```

1                    R. MARTINEZ

2    previously?

3        A.    A topic being, setting in

4    Kansas?

5        Q.    The history of discrimination

6    in Kansas?

7        A.    No, I have not.

8        Q.    Have you previously studied the

9    history of discrimination of Kansas before

10   your engagement in this case?

11       A.    No.

12       Q.    Section 4.01 refers to the

13   establishment of Kansas.  You would agree

14   that Kansas was founded as a free state,

15   correct?

16       A.    Yes.

17       Q.    And in your research did you

18   find evidence of any pro-slavery founders

19   of the city of Dodge City, specifically?

20       A.    No, they were not in that city,

21   or at least not that they had influenced

22   Dodge City.

23       Q.    Section 4.02 is referring to

24   racial discrimination against

25   African-Americans throughout history in the

1              R. MARTINEZ

2    law and Dodge City became known in Kansas

3    as the most flagrant violator of the

4    prohibition law.

5         Q.    So the reference to the

6    leadership in Dodge City violating the law

7    is specifically related to the prohibition

8    laws, correct?

9         A.    In this instance, yes.

10        Q.    Well, in your reference here to

11   Hoover and other mayors in Dodge City

12   becoming the most flagrant violators, that

13   refers specifically to prohibition law,

14   correct?

15        A.    Yes.

16        Q.    The incident described in 4.07

17   occurred in Salina, Kansas in the 1800s,

18   correct?

19        A.    At the turn of the century,

20   nearly 1893, yes.

21        Q.    So more than a hundred years

22   ago?

23        A.    Yes.

24        Q.    And the instance in 4.08,

25   incidents occurred in Rawlins County and

Page 176

1                    R. MARTINEZ
2         Q.    Do you have any context as to
3    whether these times are a little or a lot?
4              MS. MAINOO:  Objection to form.
5         A.    I was not interested in knowing
6    whether they were a lot or not.  I was
7    interested in seeing the pattern.
8         Q.    And do you have any information
9    about the level of hate crimes before 2019?
10        A.    I do not have those figures.
11        Q.    So from a pattern standpoint,
12   all you noticed was the change from 2019 to
13   2020, correct?
14        A.    Correct.
15        Q.    Section 4.19 refers to HB2717,
16   which you describe as an anti-immigration
17   bill that prohibits municipalities from
18   taking actions to prevent local law
19   enforcement from working with federal
20   immigration authorities.  Do you see that?
21        A.    Yes.
22        Q.    Why do you describe that as an
23   anti-immigration?
24        A.    I think that is how it's
25   regarded.

```
 1              R. MARTINEZ
 2       Q.    By whom?
 3       A.    By people who write about it.
 4  It is seen as that it's prohibiting
 5  municipalities from taking action to
 6  prevent local law enforcement from working
 7  so that it doesn't become a very intense
 8  process of conducting raids.
 9       Q.    Can you tell me in your own
10  words what HB 2717 has to do or to
11  prohibit?
12       A.    I would have to look at it.
13       Q.    Do you have any understanding
14  other than what is in section 4.19 as we
15  sit here today?
16       A.    I could not speak to it, but I
17  do know that in 2017, Dodge City police did
18  work with ICE on conducting a raid in Dodge
19  City.
20       Q.    That is not reflected anyplace
21  in your report, is it?
22       A.    No.
23       Q.    So that is not a basis for your
24  opinion in this report, correct?
25       A.    Not on that particular -- but
```

Page 178

1                    R. MARTINEZ
2    it also, I think -- no, strike that.
3        Q.    You stated that folks who write
4    about this bill describe it as
5    anti-immigration bill.  Where did you learn
6    about HB 2717?
7        A.    I can't recall.  The work of
8    Kris Kobach goes back some years now and he
9    is the primary driver of some of these
10   legislative bills.
11       Q.    But you are not sure of the
12   source of this information, correct?
13       A.    No.
14       Q.    And you can't describe for me
15   what about that bill is an anti-immigration
16   bill?
17            MS. MAINOO:  Objection to form.
18       A.    It basically allows federal
19   agencies to work with local agencies to
20   conduct raids and to pursue undocumented
21   immigrants.
22       Q.    And that makes it an
23   anti-immigration bill?
24       A.    In the context of which it
25   occurs.

Page 179

1                    R. MARTINEZ
2        Q.    What do you mean by that?
3        A.    From -- this is, in 2022
4    there's been a very strong anti-immigration
5    impulse and movement across the country for
6    the last several years.
7        Q.    Setting aside 4.19, the
8    remainder of the information in section 4
9    is all historical information, correct?
10       A.    I believe so.
11       Q.    And are there any evidence --
12   excuse me.  Are there any paragraphs in
13   section 4 that you cited that contains
14   evidence of what you would describe as
15   official discrimination by the state of
16   Kansas?
17            MS. MAINOO:  Objection to form.
18       A.    I think that it was reserved
19   for section 5, having to do with education.
20       Q.    So you would agree that there
21   is not anything in section 4 that
22   references official discrimination by the
23   state of Kansas, correct?
24            MS. MAINOO:  Objection to form.
25       A.    Correct.

Page 180

1                    R. MARTINEZ

2       Q.    And you are not providing any

3   testimony regarding current discrimination

4   by the state of Kansas, correct?

5       A.    Correct.

6       Q.    Tell me about your prior

7   knowledge of educational segregation of

8   Mexicans in Kansas before being engaged in

9   this lawsuit?

10             MS. MAINOO:  Objection to form.

11      A.    I think it was basically

12  centered around the case involving Topeka

13  back in the '50s.

14      Q.    You are referring to Brown

15  versus the Board of Education?

16      A.    Yes.

17      Q.    So you had general familiarity

18  of Brown versus Board of Education before

19  being engaged in this case?

20      A.    Yes.

21      Q.    Was that the extent of your

22  knowledge of educational segregation in

23  Kansas before being engaged in this case?

24      A.    Generally speaking, yes.

25      Q.    You have not written on this

Page 181

1                    R.  MARTINEZ
2    topic previously, correct?
3         A.    Correct.
4         Q.    If you look at section 5.01 you
5    refer to an 1876 statute regarding school,
6    correct?
7         A.    Yes.
8         Q.    And in 5.02 you explain that
9    "at that time first-class cities could have
10   separate elementary schools for white and
11   both colored children and segregated high
12   schools were only permitted in Kansas
13   City"?
14        A.    Yes.
15        Q.    And "second-class cities could
16   not establish separate schools for white
17   and colored children," correct?
18        A.    Correct.
19        Q.    In the late 1800s, would you
20   agree that segregated schools were
21   relatively commonplace?
22             MS.  MAINOO:   Objection to form.
23        A.    Across the country?
24        Q.    Across the country?
25        A.    Or across Kansas?

Page 188

1                    R. MARTINEZ

2        A.     So I don't have that readily,

3   but there was, you know, separations by

4   classrooms, not only in Dodge City, but in

5   other cities.  Other schools in Kansas City

6   were doing it.

7        Q.     And you don't recall the course

8   of that information, however?

9        A.     Some of it is Franco and there

10  are, I would say, other sources.

11       Q.     As best as you can recall you

12  didn't discover any information about

13  segregation in schools in Dodge City in

14  particular, correct?

15            MS. MAINOO:  Objection to form.

16       A.     I was looking at what -- what

17  was the general pattern of what was

18  happening in Kansas.

19       Q.     Do you recall the authority for

20  your conclusions in 5.08?

21       A.     Not offhand.

22       Q.     Same question for 5.09?

23       A.     I am trying to remember which

24  documents speak to those two, but I can't

25  remember right now.

Page 189

1                    R.  MARTINEZ

2        Q.     What about 5.10?

3        A.     I think there is the

4    dissertation on Argentine, which I think is

5    a neighborhood in Kansas City.  So there a

6    dissertation there.  I think the person is

7    Laird, L-A-I-R-D, and that may also be the

8    source for the other two.

9        Q.     Was that the source of your

10   conclusion at 5.11 as well?

11       A.     That one and some of the other

12   ones that spoke to educational issues in

13   Kansas.

14       Q.     You don't recall which of those

15   it was at the moment?

16       A.     No.

17       Q.     And the separation or

18   segregation that was occurring at that

19   time, we are talking about the 1920s and

20   1930s, correct?

21            MS. MAINOO:  Objection to form.

22       A.     Well, up above I think it said

23   that it continued until the 1950s when the

24   flood damage happened to the Mexican school

25   in Argentine District.  That would be 5.06.

```
 1                    R. MARTINEZ
 2   included here in this section 5, would you
 3   agree that -- let me start again.  Would
 4   you agree that you have not included any
 5   evidence of discrimination in education in
 6   the state of Kansas past the 1950s?
 7              MS. MAINOO:  Objection to form.
 8        A.    The question would be that I
 9   did not provide evidence, is that what you
10   are saying?
11        Q.    Yes, sir.
12        A.    Correct.
13        Q.    Next section, 6.0, refers to
14   the historical background of elections in
15   Dodge City.  Had you done any prior
16   research or writing on the historical
17   background of elections in Dodge City
18   before being engaged in this case?
19        A.    No.
20        Q.    So the information in section 6
21   was new to you, correct?
22              MS. MAINOO:  Objection to form.
23        A.    Generally speaking, yes,
24   depending on which piece of information you
25   are talking about.
```

Page 196

```
 1                    R. MARTINEZ
 2   across a majority across the country that
 3   -- one of the reasons was what the heck --
 4   because everybody else is doing it, I mean
 5   that is a possibility, too.
 6        Q.    6.04 refers to the
 7   Weinstein-Hays thesis?
 8        A.    Ah-ha.
 9        Q.    Correct?
10        A.    Ah-ha.
11        Q.    And you would agree that the
12   Weinstein-Hays thesis is not focused
13   specifically on the state of Kansas or
14   Dodge City in particular?
15        A.    Yes.
16        Q.    It's a broader thesis regarding
17   the movement as you described it throughout
18   the country, correct?
19        A.    Including Kansas.
20        Q.    Has this theory been challenged
21   or modified by more modern scholars or
22   recent scholars?
23              MS. MAINOO:  Objection to form.
24        A.    I have not seen it.
25        Q.    You state in 6.06 that in 1911
```

Page 197

1                    R. MARTINEZ
2    Dodge City implemented the mayoral and
3    commission model for local government using
4    an at-large election method, correct?
5         A.    Correct.
6         Q.    Was the at-large election
7    method in place in 1911 or did that begin
8    in 1911, to your understanding?
9         A.    That is one area that was a
10   little bit confusing.  I do not think that
11   the at-large method was in place at that
12   time.  My understanding is that the
13   at-large method was closely tied to the
14   commission method or form that was coming
15   into being, but I could not find what that
16   -- what type of election method was being
17   used, like in 1909 or 1908 or something
18   like that.
19        Q.    What was your source from the
20   information that you provided in 6.06?
21        A.    I don't recall.  It might be
22   the commercial from Dodge City, which is in
23   the next point.
24        Q.    6.07 you refer to the
25   Commercial Club of Dodge City and there is

Page 200

```
 1              R. MARTINEZ
 2   they had, but my sense is that they were
 3   reflecting the movement that was taking
 4   place at the time.
 5        Q.    But you understood they were
 6   elected in an at-large election, correct?
 7        A.    Yes.
 8        Q.    6.08, you state "as late as
 9   1980, no Mexican had been elected to the
10   State Commission, the County Commission,
11   the school board, nor to the State
12   Legislature, despite a few having run for
13   office."  What is the source for that
14   statement?
15        A.    I don't recall what that one
16   is.
17        Q.    Do you know how many had run
18   for office as of 1980?
19        A.    I do not.
20        Q.    And you don't know anything
21   specific about any of the people who may
22   have run, correct?
23        A.    Correct.
24        Q.    And you don't know what the key
25   issues would have been in their races,
```

Page 203

```
 1              R. MARTINEZ
 2  or it's impossible to do it.
 3      Q.   Were you aware of that context
 4  of Senator Dole's comments in this section
 5  6.10?
 6           MS. MAINOO:  Objection to form.
 7      A.   He was talking about elections
 8  and he was talking, obviously, about the
 9  at-large elections, since he is saying that
10  at-large elections cancel out minor votes.
11      Q.   Do you know anything beyond
12  that about Senator Dole's statement?
13           MS. MAINOO:  Objection to form.
14      A.   At that point in time?
15      Q.   Yes, sir.
16      A.   There are several articles on
17  this issues in the Globe at that time.
18      Q.   Did you conduct any analysis of
19  the number of Hispanic or Latino
20  individuals who had run for school boards
21  in the USD 443 School District?
22      A.   I, like I said earlier, had
23  looked at some of the -- I tried to find
24  information.  I have looked at election
25  results and where they are provided.  I
```

Page 204

```
 1                  R. MARTINEZ
 2   tried to identify those by Spanish surname,
 3   who might have been running or who are
 4   running, actually.  I don't know what you
 5   mean by analysis.
 6        Q.    Do you know anything about Dr.
 7   Mario Sanchez's election or campaign for
 8   the school board in USD 443 other than the
 9   fact that he ran and was elected?
10        A.    No, I do not.  And I know he is
11   running again this year.
12        Q.    Okay.  Section 6.12 refers to
13   the Kansas Secure and Fair Elections Act
14   that requires documentary proof of
15   citizenship when registering to vote,
16   correct?
17        A.    Yes.
18        Q.    Are you familiar with who the
19   proponents of that particular registration
20   were?
21             MS. MAINOO:  Objection to form.
22        A.    I'm not, in terms of names.
23        Q.    And are you aware of whether
24   Dodge City in particular had any
25   participation in the passage of this
```

Page 207

1                    R. MARTINEZ

2   or information with respect to the city of

3   Dodge's response, reaction or participation

4   in the polling place situation in 2018?

5                 MS. MAINOO:  Objection to form.

6        A.     No, I don't, but I know it was

7   moved outside of Dodge City.

8        Q.     Did you do any research into

9   the efforts that the city undertook to help

10  voters get to the polls during that

11  election?

12                MS. MAINOO:  Objection to form.

13       A.     I read what they planned to do.

14  They were going to have buses or -- they

15  were taking other steps, let me say that,

16  to try to facilitate participation.

17       Q.     Do you recall where you read

18  that information?

19       A.     It was either in web pages or

20  newspaper articles or something like that,

21  but it was public information.

22       Q.     Are you aware that the city did

23  provide free curb-to-curb transportation

24  for anyone who wanted it during the 2018

25  election?

Page 208

1                    R. MARTINEZ

2        A.    I am aware that they said that

3    they would.  I don't know that they did.

4        Q.    And do you have any information

5    about how many individuals used that free

6    transportation?

7        A.    I do not.

8        Q.    Do you have any information

9    about whether the polling place move had

10   any meaningful impact on the participation

11   in the election?

12            MS. MAINOO:  Objection to form.

13       A.    I don't recall.

14       Q.    Are you aware of any voter who

15   was unable to vote due to the change in the

16   polling location in 2018?

17            MS. MAINOO:  Objection to form.

18       A.    No, but I recall some article,

19   I think from Wichita, that spoke to the

20   results of the impact of it, but I don't

21   recall exactly what it said.

22       Q.    Are you aware that in

23   subsequent elections the city had forced

24   Ford County to offer polling locations that

25   are within city limits?

Page 210

1                    R. MARTINEZ
2    staying in good stead regarding their
3    voting registration and changes of address
4    and so forth.  So for, me, it kind of
5    raised the question, even with regard to
6    Ford County, what exactly is being done to
7    educate voters.
8         Q.    Did you do any research to try
9    to reach any conclusions about what Ford
10   County has done to reach voters, other than
11   this one citation in the Wichita Eagle from
12   2018?
13        A.    Well, I found, you know, that
14   they have provided some materials in
15   Spanish.  I don't know that that is enough,
16   but certainly it's a step in the right
17   direction.
18        Q.    Did you find that on the Ford
19   County website?
20        A.    I think I found it in the Dodge
21   City website.
22        Q.    Other than what you have
23   shared, did you do any independent research
24   regarding voter education efforts in Dodge
25   City?

Page 222

1                    R. MARTINEZ

2    Dodge City?

3              MS. MAINOO:  Objection to form.

4        A.    I would still go back to 6.16.

5        Q.    Anything else?

6        A.    No.

7        Q.    You would agree with me that

8    6.16, the decision about polling sites, is

9    a decision made by Ford County, not Dodge

10   City, correct?

11             MS. MAINOO:  Objection to form.

12       A.    It was made by the county

13   clerk.

14       Q.    All right, section 7.  Let's

15   pause for a just a moment.

16             MS. EBERLINE:  You want to take

17        a break or you want to keep going?

18             MS. MAINOO:  How are you

19        feeling?

20             THE WITNESS:  I'm fine.

21       Q.    Section 7 is entitled At-Large

22   Elections and Ethnic and Racial Minority

23   Voters.  Have you done any writing on this

24   topic before your engagement in this

25   lawsuit?

Page 223

1                    R. MARTINEZ

2        A.    No, this is based on review of

3   studies.

4        Q.    And that review occurred after

5   you engaged in this case, correct?

6        A.    Correct.

7        Q.    You don't purport to have any

8   independent expertise or specialty in this

9   particular area, correct?

10              MS. MAINOO:  Objection to form.

11       A.    Not as a sub-field.

12       Q.    Apart from your preparation for

13  this expert report, you have not conducted

14  any separate research on this particular

15  topic, correct?

16       A.    Correct.

17       Q.    So is the extent of your

18  knowledge on this topic what you learned in

19  the articles that you cited in this case?

20              MS. MAINOO:  Objection to form.

21       A.    The research articles.

22       Q.    And you have not done any of

23  your own studies on the impact of at-large

24  elections on racial and ethnic minorities,

25  correct?

Page 224

1                    R. MARTINEZ

2              MS. MAINOO:  Objection to form.

3        A.    I have not.

4        Q.    Would you agree with me that

5    each of the statements made in section 7

6    are general statements that relate to

7    at-large elections, rather than statements

8    that apply specifically to the city of

9    Dodge City?

10              MS. MAINOO:  Objection to form.

11        A.    I have not found a study such

12    as these that have focused on Dodge City.

13        Q.    Statement in 7.1 states that

14    "social science studies about at-large

15    elections and ethnic and racial minority

16    communities generally find that this

17    election method provides significantly less

18    minority representation than other methods

19    because of voter dilution."  Do you see

20    that?

21        A.    Yes.

22        Q.    Are the three sources that you

23    cited there in section 7.1 sources that you

24    relied on for reaching that conclusion?

25        A.    Yes.

Page 225

1                      R. MARTINEZ
2        Q.    Did you review any other
3    sources that reached different conclusions
4    about the question of whether at-large
5    elections result in less minority
6    representations of ethnic or racial
7    minorities?
8              MS. MAINOO:   Objection to form.
9        A.    I reviewed other articles that
10   either had mixed findings or that were
11   inconclusive, but the preponderance of
12   studies agree with this finding.
13       Q.    And the studies you cited here
14   are from 1988, 1990 and 1999, correct?
15       A.    Yes.
16       Q.    Did you find any studies from
17   more recent than 1999 that supported the
18   conclusion you reached in section 7.1?
19       A.    Well, down on 7.7 there is one
20   in 2002.  It's not much later, but it's
21   later.
22       Q.    Did the research that was
23   reflected in the studies you cited in
24   section 7.1, 7.2 and 7.3 address whether
25   their conclusions apply in communities that

1                    R. MARTINEZ

2    have significant racial or ethnic

3    diversity?

4              MS. MAINOO:  Objection to form.

5         A.    Some of them did.

6         Q.    What conclusions were reached

7    about that question?

8         A.    I am trying to remember.  I

9    think there are issues of proportionality.

10        Q.    Do you remember what those

11   issues were or how those issues -- what

12   result those issues created?

13             MS. MAINOO:  Objection to form.

14        A.    I think it was something like a

15   threshold that, you know, if there was a

16   certain concentration past this threshold,

17   that made a difference in it.  If it wasn't

18   past that threshold, it wasn't likely, but,

19   you know, in social science it's the

20   preponderance of studies that made the

21   difference.  So you might find a study

22   here, a study there, that doesn't find the

23   same findings and then you have to analyze

24   them to see how it was different, if they

25   are measuring the same thing, if they are

Page 227

```
 1                    R. MARTINEZ
 2   comparable studies, so on.
 3        Q.    Did the studies that you
 4   reviewed consider the impact of at-large
 5   elections in a community in which there is
 6   a majority population of Hispanic
 7   individuals?
 8             MS. MAINOO:  Objection to form.
 9        A.    I can't remember, but I do
10   remember that, you know, that the focus
11   usually tended to be in concentration in
12   particular geographic areas and so on.
13        Q.    And you don't recall the
14   details at this point?
15        A.    No.
16        Q.    Did you find that the more
17   recent articles that you reviewed suggested
18   that there was more mixed results and more
19   nuance to the results related to the impact
20   in at-large elections on minority
21   representation?
22             MS. MAINOO:  Objection to form.
23        A.    I don't recall if they were
24   more recent.  I think most of them tended
25   to be from this general period.
```

Page 236

1                        R. MARTINEZ
2        Q.     That is more accurate.  We
3    talked about three articles here so far in
4    the last few minutes that have identified
5    divided findings or unsuccessful findings
6    related to the impact of at-large elections
7    on the minorities, correct?
8                 MS. MAINOO:  Objection to form.
9        A.     Yes.
10        Q.     And you didn't include those
11    findings in your expert report, correct?
12                 MS. MAINOO:  Objection to form.
13        A.     I did not discuss them in here,
14    but I included them as other documents that
15    I have reviewed.
16        Q.     And you did consider those
17    findings in reaching your conclusions,
18    correct?
19        A.     I took them into account.
20        Q.     If you look at section 7.4 of
21    your report, I see there is a reference
22    here to the Ortiz article from 1982,
23    correct?
24        A.     Ah-ha.
25        Q.     Yes?

1                    R. MARTINEZ

2        A.    Yes.  Sorry.

3        Q.    Is that the only citation for

4   that finding or the only source of that

5   finding in 7.4?

6        A.    There was another one, but I

7   could not find it when I was finishing up

8   this writing.

9        Q.    Do you know what it is, as you

10  sit here today?

11       A.    No, because I -- that was one

12  of the reasons that I could not find it.

13       Q.    Do you have any information

14  whether a sense of powerlessness is an

15  impact in the decisions of voters in Dodge

16  City in particular?

17            MS. MAINOO:  Objection to form.

18       A.    I think it's a reasonable

19  inference that people who may participate

20  in voting, for example, and never get their

21  preferred candidate elected are likely to

22  feel disempowered.

23       Q.    Have you done any research in

24  to whether there are issues that have come

25  before the Dodge City Commission that has

```
 1                    R.  MARTINEZ
 2   article  from  1979,  correct?
 3        A.    Yes.
 4        Q.    And  do  you  have  evidence  to
 5   support  that  that  statement  is  still  true
 6   today?
 7        A.    I  don't  have  evidence  that  is
 8   still  true  today,  but  I  don't  have  evidence
 9   that  minority  candidates  have  improved
10   their  competitive  advantage  with  resources
11   and  campaigns.
12        Q.    And  the  Berry  and  Dye  article
13   was  referencing  the  impact  of  at-large
14   elections  on  Black  voters  and  Black
15   candidates,  correct?
16        A.    Yes.
17        Q.    And  it  did  not  reference
18   Hispanic  voters  in  particular,  correct?
19        A.    They  speak  to  minority
20   candidates,  so  I  don't  know  if  that  is  just
21   Blacks,  but  I  mean  that  is  the  language
22   that  is  used  and  the  study  tends  to  focus
23   on  Blacks.
24        Q.    Section  7.7  you  state  "changes
25   from  at-large  election  methods  to  single
```

Page 241

1                    R. MARTINEZ

2    district elections tends to increase

3    minority representation," do you see that

4    there?

5         A.    Yes.

6         Q.    And you agree that we talked

7    through some articles that challenge that

8    conclusion, correct?

9         A.    Yes.

10        Q.    To your knowledge, does the

11    size of the city matter in assessing

12    whether changes from at-large election

13    methods to single district elections

14    increase minority representation?

15        A.    I remember reading something

16    about that, but I don't recall the

17    conclusion.  Most of what I recall is the

18    concentration.

19        Q.    Do you have any evidence that

20    Dodge City implemented their at-large

21    election for discrimination purposes?

22        A.    I believe that when they --

23    following the work of Woodward and Kousser,

24    I believe that when they implemented it

25    back in 1911 or 1910, that they were

Page 242

1                    R. MARTINEZ
2   seeking to ensure that the businessmen and
3   so on were the ones that were elected to
4   office and were running local government.
5        Q.    And that is a conclusion that
6   you are inferring from a national -- let me
7   start again.  Your conclusion about the
8   purpose of implementing at-large elections
9   in Dodge City is extrapolated from your
10  understanding of the reasons that at-large
11  elections were implemented nationwide, is
12  that fair?
13            MS. MAINOO:  Objection to form.
14       A.    Were implemented at multiple
15  cities throughout the country.
16       Q.    And so your conclusions about
17  that are not specific to Dodge City, is
18  that accurate?
19            MS. MAINOO:  Objection to form.
20       A.    That's accurate.  I think they
21  were part of a wave of movements, not a
22  movement.
23       Q.    Do you have any evidence that
24  the use of at-large elections in Dodge City
25  is presently having the effect of limiting

Page 243

```
 1              R. MARTINEZ
 2   the election of Hispanic candidates?
 3              MS. MAINOO:  Objection to form.
 4        A.    Say that again.
 5        Q.    Do you have any evidence that
 6   the use of at-large elections in Dodge City
 7   is having the effect of limiting the
 8   election of Hispanic candidates?
 9              MS. MAINOO:  Same objection.
10        A.    I don't, but it would be
11   consistent with the research that I cite.
12        Q.    Do you have any evidence that
13   the use of at-large elections in Dodge City
14   is being used to limit the electoral
15   influence of the Hispanic population?
16              MS. MAINOO:  Objection to form.
17        A.    I don't, but it would be
18   consistent with what I have been saying
19   about the perceived threat in the city.
20              MS. EBERLINE:  Let's take a
21        break here.
22              (Whereupon, a short recess was
23        taken.)
24        Q.    Let's look at section 8.02,
25   which you entitled Conclusions.  Are you
```