IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| MIGUEL COCA and<br>ALEJANDRO RANGEL-LOPEZ,<br><br>    *Plaintiffs,*<br><br>vs.<br><br>CITY OF DODGE CITY, a municipal corporation, the DODGE CITY COMMISSION, E. KENT SMOLL, in his official capacity as Mayor of Dodge City, MICHAEL BURNS, in his official capacity as Vice-Mayor of Dodge City, RICK SOWERS, in his official capacity as a member of the Dodge City Commission, CHUCK TAYLOR, in his official capacity as a member of the Dodge City Commission, and JOSEPH NUCI, in his official capacity as a member of the Dodge City Commission,<br><br>    *Defendants.* | Case No. 22-1274-EFM |

**MEMORANDUM AND ORDER**

Before the Court are Defendants' Motion to Exclude Expert Witness Matthew Barreto (Doc. 143) and Motion to Exclude Expert Witness Dr. Rubén Martinez (Doc. 141). This case concerns Plaintiffs Miguel Coca and Alejandro Rangel-Lopez's claims under Section 2 of the Voting Rights Act ("VRA") and the Fourteenth Amendment's Equal Protection Clause. Currently, Defendants' motion for summary judgment remains pending before the Court. Key to that motion

are the present Motions to Exclude, in which Defendants seek to exclude Plaintiffs' experts on racially polarized voting in Dodge City and historical discrimination in Dodge City. For the reasons stated below, the Court grants in part and denies in part each Motion.

## I.      Factual and Procedural Background

This is a voting rights case in which Plaintiffs claim Defendants violate Section 2 of the Voting Rights Acts by holding at-large election for seats on the City's Commission. Plaintiffs submitted reports by the following experts to support their claims both at summary judgment and presumably during trial. Defendants now move to exclude each experts' report for various reasons.

**A.     Dr. Barreto**

Dr. Barreto's qualifications as an expert in voting rights cases are not in question. Therefore, the Court need not list them here. Suffice to say, Dr. Barreto is well-accredited, sufficiently acclaimed, and thoroughly immersed in the academic discussion surrounding voting rights in the United States, particularly those of Latino voters. He also coauthored *eiCompare,* a software that analyzes election results to assess racially polarized voting. Dr. Barreto currently teaches at University of California, Los Angeles ("UCLA"). In fact, the present case stems from a class project conducted under Dr. Barreto's supervision at UCLA. While there, he cofounded with attorney Chad Dunn the UCLA Voting Rights Project. Several attorneys from the UCLA Voting Rights Group, including Chad Dunn, represent Plaintiffs in this case.

In the present case, Plaintiffs rely on Dr. Barreto's opinion to show that the second and third *Gingles* factors are met in this case because racially polarized voting exists in Dodge City.[1]

---

[1] *See generally* Doc. 71, Memorandum and Order (laying out legal standard for establishing a Section 2 vote dilution claim under *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)).

To arrive at his opinion, Dr. Barreto used homogenous precinct analysis and ecological inference analysis with both endogenous and exogenous elections. He ultimately concluded that both Hispanics and whites in Dodge City consistently vote en bloc, with the white bloc votes preventing Hispanics preferred candidates from being elected.

To reach this conclusion, Dr. Barreto reviewed four Commission election between 2014 and 2021, as well as 20 other general elections between 2014 and 2022. Dr. Barreto states there were 11,743 registered voters in nine precincts within Dodge City during the November 2022 general election. He also claims there were 4,037 voters within the "three majority-Latino precincts." Dr. Barreto does not identify which precincts are Latino-majority. Nor does he provide any numbers or other population data to support this claim. However, data from the 2021 Commission election shows the three precincts with the highest Latino voter population: Precinct 3 with 59.9% Latino voters; Precinct 2 with 54.5% Latino voters; and Precinct 1 with 39.1% Latino voters.

**B.     Dr. Martinez**

Dr. Ruben Martinez is a professor emeritus at Michigan State University, having retired in 2022. While there, he taught sociology and served as Director of the Julian Samora Research Institute, which supports Latino communities in the Midwest. His scholarship has concentrated on social inequality, intergroup relations, social movements, and political power.

Before this case, Dr. Martinez had not performed any research or analysis of Kansas history, Dodge City history, the Voting Rights Act, or election systems. Neither has he previously studied impact of at-large voting systems versus multi-district voting systems on any specific population.

In preparation for testifying in this case, Dr. Martinez reviewed multiple sources regarding historic segregation in Dodge City. He also spent two days in Dodge City itself. During that visit, Dr. Martinez informally interviewed one individual who complained of how long the City was taking to pave the brick streets in his neighborhood. Dr. Martinez took no substantive notes during the meeting, he does not recall the location of the interview, and he did not ask for the individual's name. Dr. Martinez also spent some time driving around Dodge City, claiming to be able to distinguish from his car between Hispanic and white neighborhoods.

## II.     Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under this rule, the Court must first "determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion."[2] If so, then relevant expert opinion testimony is admissible if: (1) such testimony is based upon sufficient facts or data; (2) it is a product of reliable principles and methods; (3) the witness applied the principles and methods reliably to the facts of the case; and (4) the testimony is helpful to the trier of fact.[3] As these requirements demonstrate, the court is charged as a gatekeeper to admit only expert testimony that is relevant and reliable.[4] This is a flexible inquiry specific to the facts of the case at hand.[5] The burden is on the party offering the expert testimony to show that it is admissible.[6] However, "[t]he

---

[2] *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (internal quotation marks and citation omitted).

[3] Fed. R. Evid. 702.

[4] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[5] *Id.* at 593; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (rejecting formulaic application of reliability factors discussed in *Daubert* because "[t]oo much depends upon the particular circumstances of the particular case at issue").

[6] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community[, only] that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."[7]

"The [C]ourt has discretion to determine how to perform its gatekeeping function under *Daubert*."[8]  When neither party has requested a trial by jury, "*Daubert*'s standards must still be met, [but] the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise."[9]  Thus, "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation."[10]  As this Court has previously held

> *Daubert* gate-keeping, after all, serves to prevent the jury from hearing unreliable scientific evidence.  Because the doctrine is designed to protect juries it is largely irrelevant in the context of a bench trial. There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.[11]

---

[7] *Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1211 (D. Kan. 2006) (quoting *Mitchell v. Gencorp. Inc.*, 165 F.3d 778, 781 (10th Cir.1999)); *see also Foster v. USIC Locating Servs., LLC*, 2018 WL 3757567, at *3 (D. Kan. 2018) ("[R]ejection of expert testimony is the exception rather than the rule.") (citing Fed. R. Evid. 702 advisory committee's notes).

[8] *In re EpiPen (Epinephrine Injection, USP) Mktg. Sales Practices & Antitrust Litig.*, 2020 WL 1164869, at *3 (D. Kan. 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).

[9] *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009).

[10] *Ramos v. Banner Health*, 1 F.4th 769, 779 n.4 (10th Cir. 2021) (noting with approval district court's admittance of "questionable" expert testimony during bench trial) (further citation and quotations omitted).

[11] *Lawson v. Spirit Aerosystems, Inc.*, 2021 WL 2290822, at *4 (D. Kan. 2021) (further citations, quotations, and brackets omitted).

The Court may, but is not required to, conduct a *Daubert* hearing to fulfill this role.[12] Here, neither party has requested a *Daubert* hearing, and after reviewing the parties' briefs, the Court concludes that the Motions can be decided without a *Daubert* hearing.

### III. Analysis

**A. The Court grants in part and denies in part Defendants' Motion to Exclude Dr. Barreto.**

Defendants claim that Dr. Barreto's report should be excluded as scientifically unreliable. In particular, Defendants take issue with Dr. Barreto's homogeneous precinct analysis and his ecological inference analysis. Lastly, Defendants claim that Dr. Barreto is biased to the point that his testimony must be excluded in its entirety. The Court will address each argument in turn.

*1. Homogenous precinct analysis*

First, Defendants claim that Dr. Barreto's homogeneous precinct analysis fails under *Daubert* because it lacks sufficient data. Homogeneous precinct analysis ("HPA")—widely referred to as "extreme case analysis"—is an accepted tool used by courts in determining whether voters are racially polarized.[13] It works by "examin[ing] the actual voting percentages received by candidates in racially homogeneous precincts."[14] In a precinct with a voter population comprised almost entirely of Hispanics, Hispanic voters' preferred candidate might be inferred if any candidate receives a strong majority of votes.[15] This analysis is relevant to the second and third *Gingles* preconditions because it may show whether minorities and white voters vote in blocs.

---

[12] *In re* EpiPen, 2020 WL 1164869, at *3 (citing *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)).

[13] *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1313 (10th Cir. 1996).

[14] *Id.*

[15] *See id.*

Dr. Barreto's report claims there are three majority-Latino precincts as of the November 2022 election. However, he fails to identify those precincts, share the percentage of the Latino population within, or even provide a citation for this statement. The only hard data provided to the Court regarding the Latino percentage shows that in 2021 only two precincts had a majority Latino population: Precinct 2 with 54.5% Latino voters and Precinct 3 with 59.9% Latino voters. The next highest percentage comes from Precinct 1 where Latinos comprised 39.1% of the eligible voting population.

The present Motion arises because Defendants argue that such small majorities provide insufficient data from which to conduct a homogeneous precinct analysis. Citing recent caselaw from the Eastern District of Michigan[16] and the Eastern District of California,[17] Defendants claim that HPA is only reliable when the ethnic minority comprises 90% or more of the precinct's population.[18]

In contrast, Plaintiffs cite several scholarly articles—two written by Dr. Barreto—holding that HPA applies even when a minority population is 50% or greater in a given precinct. However, Plaintiffs do not cite a single case in support of their position. The Court is not so easily convinced.

Dr. Barreto's HPA, based on two precincts with a Latino CVAP of less than 60% and a precinct with only a 39.1% Latino CVAP will not be helpful to the trier of fact.[19] From a review of the limited caselaw on this subject, courts seem united in holding that an HPA is unhelpful when

---

[16] *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 597 n.2 (E.D. Mich. 2019).

[17] *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1118 (E.D. Cal. 2018).

[18] *See, e.g.*, *Large v. Fremont Cnty.*, 709 F. Supp. 2d 1176, 1197 (D. Wyo. 2010) (finding expert's HPA analysis of little value when Native American voting population was less than 90% in each precinct).

[19] It is entirely possible that the population demographics changed between 2021 and 2022. But Dr. Barreto fails to provide any statistical data from which the Court may determine whether that change occurred. Thus, the Court is unable to find that Dr. Barreto reliably applied HPA principles and methods to the underlying dataset.

no precinct contains 90% or greater of the minority CVAP. This makes sense. The entire point of HPA is that a precinct is "homogeneous," and thus the racially polarized voting may be inferred because the individual voters are clearly reflected in the overall percentage of votes received by each candidate. If there are no homogeneous precincts, then HPA will not help the trier of fact. Perhaps ratios under 90% might suffice in certain contexts. But accepting the 60% ratio urged by Plaintiff to suffice dips heavily into speculation and ignores the fact that HPA functions as an "*extreme* case analysis." It belies credulity to find that a 60% Latino majority within a precinct constitutes an extreme case. Accordingly, the Court finds that Dr. Barreto's HPA is unreliable. It would not assist the trier of fact because it is based on insufficient facts and data. Accordingly, the Court grants Defendants' Motion as to Dr. Barreto's HPA analysis in this case and excludes the same.

2. *Ecological inference analysis*

Dr. Barreto's second analysis relies on ecological inference (EI), an inferential analysis championed by Dr. Barreto himself through the development of his *eiCompare* software. EI enjoys a wide acceptance from courts dealing with vote dilution cases.[20] Nevertheless, Defendants attack Dr. Barreto's use of this technique on three grounds: (1) failure to include confidence intervals, i.e., margin of error; (2) insufficient data regarding endogenous election; and (3) improper reliance on exogenous elections.

---

[20] *See, e.g.*, *United States v. Alamosa County*, 306 F. Supp. 2d 1016, 1029 (D. Colo. 2004); *Large*, 709 F. Supp. 2d at 1193; *Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, 612 F. Supp. 3d 1232, 1275 (M.D. Ala. 2020); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 597 (E.D. Mich. 2019); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1118 (E.D. Cal. 2018); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1290 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 757–58 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F. App'x 255 (5th Cir. 2015); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 387–88 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004).

a. Confidence intervals

Quoting *Daubert*, Defendants emphasize that "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error."[21] Similarly, the Reference Manual on Scientific Evidence encourages the use of "confidence intervals" and other margins of error, defining the former as

> An estimate, expressed as a range, for a parameter. For estimates such as averages or rates computed from large samples, a 95% confidence interval is the range from about two standard errors below to two standard errors above the estimate. Intervals obtained this way cover the true value about 95% of the time.[22]

Without questioning EI or Dr. Barreto's qualifications, Defendants nevertheless argue that his EI analysis is unreliable because Dr. Barreto failed to include any confidence intervals or other margin of error analysis in his report. Although this lack of a recognized margin of error is relevant to a *Daubert* analysis, Defendants can point to no voting dilution case where an expert has been excluded on that basis. Rather, caselaw dealing with voting rights appears to accept that confidence intervals may be unnecessary in this context.[23] Defendants provide no cases holding directly to the contrary. The Court also finds it relevant that discussion of experts' use of confidence intervals and other margins of error with voting dilution cases seem to universally occur *after* a bench trial.[24] It follows that the lack of confidence intervals or other margins of error may be addressed by the Court after a bench trial without the Court laying down its gatekeeping

---

[21] 509 U.S. at 594.

[22] Committee on the Development of the Third Edition of the Reference Manuel on Scientific Evidence, Federal Judicial Center, *Reference Manual on Scientific Evidence*, 284–85(3d ed. 2011).

[23] *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1309 (N.D. Ga. 2022).

[24] *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 389–90 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021).

function under *Daubert*. From this persuasive precedent, the Court concludes that Dr. Barreto's report is not per se unreliable for failing to include confidence intervals. Thus, the Court will not exclude Dr. Barreto's report on this ground.

      b. Endogenous elections

Endogenous elections are those which involve the elected office at issue in the case at bar. Here, the endogenous elections referenced by Dr. Barreto are those in which citizens elected Commission members through the at-large voting system. In his report, Dr. Barreto only analyzes four elections in a city with nine precincts. Defendants argue that Dr. Barreto's sample size is insufficient to produce a reliable opinion.

To support their position, Defendants cite *Cisneros v. Pasadena Independent School District*.[25] There, Dr. Barreto himself testified during a bench trial about the dangers of limited data during endogenous election.[26] He informed the court that "the very small number of voting precincts makes it more difficult to analyze voting patterns and make determinations of racial bloc voting."[27] Notably, the number of precincts at issue was 58, which were consolidated at 11 polling stations.[28] The total voting age population was 164,845.[29] Furthermore, Dr. Barreto testified that two elections "are not frequent or numeric enough to draw conclusions about the current state of the environment in Pasadena."[30]

---

[25] 2014 WL 1668500 (S.D. Tex. 2014).

[26] *Id.* at *12.

[27] *Id.*

[28] *Id.* at *11.

[29] *Id.* at *12.

[30] *Id.* at *12.

The irony of these statements in light of Dr. Barreto's present report is not lost on the Court. Plaintiffs counter by claiming the Dr. Barreto's most recent methodology, Bayesian Improved Surname Geocoding ("BISG") was developed after *Cisneros* to address situations with limited data pools. Defendants do not reply to this argument.

Despite the sparse data from endogenous elections available to Dr. Barreto, the Court is unwilling to find only four elections, nine precincts, and one polling location insufficient as a matter of law from which Dr. Barreto may draw his conclusion. Furthermore, Defendants offer no challenge to Dr. Barreto's use of BISG data as sufficient to support Dr. Barreto's analysis. Of course, during the forthcoming trial, the Court may consider the sparsity of the data in evaluating the weight and credibility of Dr. Barreto's testimony. But for the time being, the Court declines to grant Defendants' Motion on this ground.

      c. Exogenous elections

Finally, Defendants object to Dr. Barreto's report so far as it relies on partisan exogenous elections. An "exogenous election" refers to an election other than the type at issue in a pending case. Here, the exogenous elections upon which Dr. Barreto relies are the general partisan elections in Dodge City for state and federal offices. Although courts recognize the "limited probative value" of analyzing exogenous elections, they also uniformly recognize their relevance in voting dilution cases, especially when data concerning endogenous elections is limited.[31] Indeed, Defendants have not identified a single Section 2 case where the Court excluded an expert's opinion because it relied in part on analyzing exogenous elections.

---

[31] *Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 297 (5th Cir. 2016); *see also, e.g.*, *Large*, 709 F. Supp. 2d at 1193-1194; *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 165 (W.D. Tex. 2022), *appeal dismissed sub nom. Brooks v. Abbott*, 143 S. Ct. 441 (2022) ("[T]hough we agree that voter behavior in general elections is relevant, defining voter cohesion is ultimately a legal question reserved to the Court.").

Second, Dr. Barreto's opinion does not rest solely on exogenous elections. Rather, the exogenous elections analyzed by Dr. Barreto constitute additional support for his ultimate conclusion that racially polarized voting exists in Dodge City. While Defendants rely on their own expert to rebut Dr. Barreto's opinion, any battle of the experts is best reserved for trial. And at trial, the Court will determine the weight of this extra analysis in showing racially polarized voting. Accordingly, the Court denies Defendants' Motion on this ground.

*3. Bias*

Finally, Defendants ask that Dr. Barreto be excluded on the basis of bias. An expert's bias, however, "goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination."[32] Still, there is a line of cases holding that expert witnesses who become advocates for a cause lose all credibility, thus warranting exclusion.[33] "In these cases, the critical facts were that the experts had affirmatively sought employment from the plaintiffs and that the experts had preconceived notions before the litigation commenced."[34]

Defendants contend that the circumstances on this case bring Dr. Barreto's bias into question. First, this case originated from a class project under Dr. Barreto's supervision at UCLA. Second, many of the attorneys on this case are from the UCLA Voting Rights Project, an organization cofounded by Dr. Barreto. One of those attorneys is Chad Dunn, Dr. Barreto's cofounder.

---

[32] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *5 (D. Kan. 2021) (quoting *United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. 1998)).

[33] *See Kelley*, 6 F. Supp. 2d. at 1183 (summarizing cases).

[34] *Id.*

These circumstances may be suspicious and are certainly relevant to Dr. Barreto's credibility in this case. But the Court declines to find without more facts that Dr. Barreto should be barred from even testifying due to bias. Any suggestion that Dr. Barreto's affirmatively sought employment or had preconceived notions are purely inferential and unsupported at this point. Thus, the Court declines to exclude Dr. Barreto on the basis of bias.

### B. The Court grants in part and denies in part Defendants' Motion to Exclude Dr. Martinez.

#### 1. Qualifications

Defendants first challenge Dr. Martinez's qualifications to serve as an expert in this case. In short, Dr. Martinez has zero prior experience with Dodge City history, Kansas history, or the Voting Rights Act. Furthermore, he is a sociologist, not a historian. Considering that Dr. Martinez opines on "the history of official discrimination in Dodge City and Kansas and the historical background of the at-large method of election in Dodge City and Kansas," Defendants' concern is understandable.

To qualify as an expert on a particular subject, the witness must "possess skill, experience, or knowledge in the particular field" or that subject must "fall within the reasonable confines of her expertise."[35] Thus, an expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury."[36]

The parties do not dispute that Dr. Martinez lacks skill, experience, or knowledge regarding in the particular field of voting rights and Kansas history. Instead, the question becomes whether

---

[35] *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (further citations and quotations omitted).

[36] *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (citation omitted).

these issues fall within the reasonable confines of Dr. Martinez's expertise as a political sociologist.

At its core, this is a case about racial discrimination. And racial discrimination—particularly in a historical and sociopolitical context—falls squarely within Dr. Martinez's wheelhouse of expertise. True, Dr. Martinez has no prior experience with Dodge City or voting rights cases. But Defendants fail to point to any analogous cases showing that the lack of this particularized expertise disables Dr. Martinez from being able to offer helpful testimony after reviewing Dodge City's history in preparation for this case. Thus, the Court denies Defendants' Motion on this ground.

*2. Reliance on secondary sources*

Much of Defendants' Motion focuses on Dr. Martinez basing his report on secondary sources instead of conducting his own research or possessing prior knowledge. However, Defendants do not identify any case where a court found an expert opinion based solely on secondary sources inadequate as a matter of law. Rather, federal caselaw maintains that "an expert witness can express an opinion that is based in part or solely upon hearsay sources," including secondary sources.[37] In 2004, the District of South Dakota summed up Defendants' argument and the proper rebuttal quite well:

> Defendants contend that Dr. McCool lacks a sufficient factual basis for his report because he relies on secondary sources. *Daubert* does not mandate that experts must rely on any particular source of information. Although primary sources may be more persuasive, defendants can "require him to offer valid explanations as to why his conclusions [remain] reliable" during cross examination.[38]

---

[37] *Munoz v. FCA US LLC*, 495 F. Supp. 3d 1008, 1013 (D.N.M. 2020) (citing *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971); *Tilstra v. BouMatic LLC*, 791 F.3d 749 (7th Cir. 2015); *In re James Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992); *Arkwright Mutual Inc. So. v. Gwinner Oil, Inc.*, 125 F.3d 1176 (8th Cir. 1997)).

[38] *Cottier v. City of Martin*, 2004 WL 6036041, at *4 (D.S.D. 2004) (quoting *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001).

Ultimately, Dr. Martinez's nigh-exclusive reliance on secondary sources goes to the persuasive value of his testimony, a factor the Court can best evaluate at trial. Therefore, the Court will not exclude Dr. Martinez's testimony on this ground.

*3. Dr. Martinez's personal observations*

Defendants also challenge portions of Dr. Martinez's report as lacking sufficient data to support of his opinion. Mostly, this concerns Dr. Martinez's personal observations made during his two-day trip to Dodge City. While there, he informally interviewed one person and drove around Dodge City. For example, in paragraph 3.22, Dr. Martinez opines that housing in Dodge City is highly segregated. When questioned during his deposition, Dr. Martinez admitted that the only basis for this opinion was his own observations while "driving around the city and looking at residents and people in those sections of the city." He did not review census data or other demographic information regarding racially compact housing in Dodge City. He did not give any reason as to how he could visually identify homes as being owned by Hispanics versus whites. The Court finds that wandering around a city and drawing unsupported conclusions about racially segregated housing fails to meet *Daubert*'s standards for reliability, even for a bench trial. Thus, the Court excludes the last sentence of paragraph 3.22.

Likewise, paragraph 3.19 recounts Dr. Martinez's informal interview with a Dodge City resident from Zacatecas, Mexico. Dr. Martinez recounts the resident's complaint that the City had not yet paved the brick streets in his neighborhood. It is not clear why Dr. Martinez includes this information gathered offhandedly from someone whose name he did not bother to find out. During his deposition, Dr. Martinez admitted that the individual's opinion regarding the difficulty of getting the City to pave his street was not evidence of official discrimination. Without further

detail, it is similarly irrelevant as evidence of the history of race relations in Dodge City. Given that Dr. Martinez's employment in this case starts and stops with those two categories, an individual's unverified statement unrelated to either falls well outside the scope of his testimony. Perhaps realizing this, Plaintiffs chose not to respond to Defendants' argument on this point. Thus, the Court excludes paragraph 3.19 in its entirety.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Exclude Dr. Matthew Barreto (Doc. 143) is **GRANTED in part** and **DENIED in part.**

**IT IS THEREFORE ORDERED** that Defendants' Motion to Exclude Dr. Ruben Martinez (Doc. 141) is **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

Dated this 11h day of December, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE